STATE OF CONNECTICUT *v.* EARL
MARTIN ERICKSON
(SC 18391)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued January 5—officially released June 29, 2010

*Michael T. Meehan*, with whom, on the brief, was *Edward J. Gavin*, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *Jonathan C. Benedict*, former state's attorney, and *Nicholas J. Bove*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Earl Martin Erickson, appeals from the judgment of conviction,[1] rendered after a jury trial, of assault of an elderly person in the third degree in violation of General Statutes § 53a-61a (a) and assault of public safety personnel in violation of General Statutes § 53a-167c (a) (1). The defendant was charged with assaulting Richard Orr, a seventy-eight year old state marshal, as Orr was leaving the defendant's home following in-hand service of a subpoena. On appeal to this court, the defendant claims that the trial court improperly (1) denied his supplemental request to disclose or to conduct an in camera inspection of Orr's personnel file, (2) denied him his constitutional rights of confrontation and to present a defense by limiting his cross-examination of Orr on two issues that would have been relevant in assessing Orr's credibility, and (3) denied him an opportunity to present the testimony of a third party witness on the issue of whether Orr had crossed the threshold of the defendant's home in an unsuccessful attempt to serve the defendant with the subpoena several days prior to the incident in question. The state responds that the trial court properly exercised its discretion in denying the

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

defendant's request to disclose or to conduct an in camera inspection of Orr's personnel file, afforded the defendant a meaningful opportunity to cross-examine Orr and precluded the testimony of the third party witness regarding Orr's prior attempt to serve the defendant with the subpoena. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of March 9, 2007, Orr drove with his stepson to the defendant's home in the town of Monroe to serve him with a subpoena issued by the department of labor. On that evening, Orr was wearing a dark navy shirt and a baseball cap identifying him as a state marshal. Upon arriving at the residence, Orr got out of his car, approached the door that was closest to the driveway, rang the bell and rapped on the door with his flashlight.[2] Receiving no response but seeing lights on inside, he went to a second door on another side of the house, rang the bell and rapped on the door with his flashlight. Again receiving no response, Orr peered through a window and saw the defendant lying stark naked on the sofa. After repeatedly knocking and rapping on the window with his flashlight, Orr observed a large dog that appeared to be a Doberman approach the window, barking loudly and snarling. The dog then went over to the sofa, pawed at the defendant and awakened him. Having been thus awakened, the defendant finally got up and, without bothering to dress, walked over to the door and opened it.

As Orr stepped up to the threshold of the home,[3] the defendant angrily demanded to know who he was and

[2] Orr testified that his stepson got out of the vehicle at the same time and remained standing by the vehicle, approximately forty to fifty feet from the door where the assault took place, throughout the incident.

[3] According to Orr, he stood on the threshold throughout his encounter with the defendant, with the one possible exception of when he touched the defendant with the subpoena.

"what the hell do you want?" Orr, who was holding the subpoena and a $5 witness fee in his hand, showed the defendant his badge, identified himself as a marshal and told the defendant that he had come to serve him with a subpoena. The defendant replied that he did not care who Orr was and, in foul and offensive language, ordered him to leave. Orr repeated that he had a subpoena from the state and touched the defendant with the document. Orr then dropped the subpoena and the $5 witness fee on the floor. The defendant again ordered Orr to leave and demanded to know if he could read the "do not enter" sign on the street in front of his home. Orr replied in the affirmative but added that he was authorized to enter the property for the purpose of serving the subpoena.[4] Without warning, the defendant grabbed Orr by the shoulders and violently shoved him out the doorway. Orr fell heavily to his left in a twisting motion and landed facedown on the porch, sustaining bruises, a sprained left knee, a scraped left elbow, injuries on both hands, smashed eyeglasses and cuts on his face. As Orr walked back to his car, the defendant appeared at the kitchen door and continued yelling at him. Orr replied that he intended to lodge a criminal complaint against the defendant and drove immediately to the Monroe police department, where he asked to file a report. After Orr left, the defendant telephoned the police, claiming that Orr had trespassed on his property by crossing the threshold of his home when he served the subpoena. Thereafter, Orr and his stepson gave written statements to the police, who subsequently went to the defendant's home to investigate the complaint.

On or about July 27, 2007, the state filed an amended long form information charging the defendant with,

---

[4] Orr later testified that a state marshal may enter a property to serve a subpoena but may not cross the threshold of a person's home unless invited inside.

inter alia, one count each of assault of an elderly person in the third degree and assault of public safety personnel for his actions with respect to Orr.[5] The trial commenced on July 31, 2007, and the jury returned guilty verdicts on both counts on August 2, 2007. Thereafter, the trial court sentenced the defendant to a total effective sentence of five years imprisonment, execution suspended after two years and five years probation,[6] to which special conditions including restitution and anger management counseling were attached. This appeal followed.

The defendant appeals from the judgment of conviction with respect to both offenses. We begin with his claims insofar as they pertain to his conviction of assault of public safety personnel, to which he raised the affirmative defense that Orr was not acting in the lawful performance of his duties when he crossed the threshold of the defendant's home. We then discuss his claims relating to his conviction of assault of an elderly person.

I

A

The defendant first claims that the trial court improperly failed to grant his supplemental request to disclose Orr's personnel file or to conduct an in camera inspection of the file to determine if disclosure was permissible. The defendant contends that evidence in the file

---

[5] The state also charged the defendant with two counts of interfering with an officer in violation of General Statutes (Rev. to 2005) § 53a-167a (a) for his actions with respect to several police officers who came to his house later that evening to investigate the incident. The jury, however, acquitted the defendant of those charges.

[6] The court sentenced the defendant to five years imprisonment, execution suspended after two years, and five years probation on the assault of public safety personnel conviction and to the mandatory minimum of one year imprisonment on the conviction of assault of an elderly person in the third degree, the latter to run concurrently with the former.

relating to prior complaints against Orr was material and relevant to Orr's credibility on the issue of whether he had crossed the threshold of the defendant's home, thus acting outside the scope of his official duties and justifying the defendant's use of reasonable force to resist the unlawful entry. The defendant further contends that the trial court's refusal to grant his request was harmful error because the state's entire case hinged on whether Orr's testimony that he had not crossed the threshold was credible.[7] The state responds that the trial court properly denied the request without conducting an in camera inspection of the file because its contents were neither relevant nor material to the issues in the case. We agree with the state.

The following additional facts and procedural history are relevant to our resolution of this claim. On July 26, 2007, the defendant filed a request to charge that included the affirmative defenses of (1) self-defense,[8]

[7] The defendant also claims that, "[w]hen a trial court improperly deprives a defendant of an opportunity to cross-examine a state's witness as to whether he was acting in the performance of his official duties, it is a violation of the defendant's state and federal constitutional right to confrontation and his right to present a defense." To our knowledge, this court has never reviewed a claim pertaining to the disclosure or the in camera inspection of a public official's personnel file on constitutional grounds. See *State* v. *Januszewski*, 182 Conn. 142, 170–75, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); *State* v. *Betances*, 265 Conn. 493, 505–508, 828 A.2d 1248 (2003). Moreover, we noted in *State* v. *Januszewski*, supra, 174 n.25, in which the defendant did not argue that his claim involved the violation of a constitutional right, "that while the right of cross-examination is fundamental in a criminal trial . . . it is . . . no universal solvent for reducing everything to admissibility." (Citation omitted; internal quotation marks omitted.) In the present case, the defendant makes no further reference to constitutional principles in his discussion of the disclosure claim. We thus decline to review the claim on constitutional grounds. See, e.g., *Ruggiero* v. *Pellicci*, 294 Conn. 473, 481 n.5, 987 A.2d 339 (2010) (declining to review inadequately briefed claim).

[8] General Statutes § 53a-19 (a) provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose . . . ."

(2) the common-law right to resist unlawful entry,[9] (3) defense of premises under General Statutes § 53a-20,[10] and (4) Orr's failure to serve the subpoena in lawful performance of his duties under § 53a-167c (a) (1).[11] On July 27, 2007, prior to commencement of the trial, the defendant filed a supplemental request for, inter alia, (1) disclosure of "all documents, records, and/or information pertaining to all disciplinary action(s) instituted and/or taken against" Orr in his capacity as a state marshal, (2) "an in camera inspection of the data requested for any and/or all material relevant to the issue of credibility and/or the use or allegations or accusations of the use of excessive force" by Orr in his capacity as a state marshal, and (3) the release of "any and all documents, records, and/or information pertaining to all disciplinary actions instituted and/or taken against [Orr] which would be relevant to the issue of credibility or the allegation or accusation of the use of excessive force."

On July 30, 2007, the court heard argument on the motion. Defense counsel explained that Elizabeth Col-

[9] Under the common law, an unlawful, warrantless intrusion into a person's home creates a privilege to resist, which was recognized by this court in *State* v. *Gallagher*, 191 Conn. 433, 442, 465 A.2d 323 (1983), overruled in part on other grounds by *State* v. *Brocuglio*, 264 Conn. 778, 786, 826 A.2d 145 (2003), but was limited in *Brocuglio* to conduct that does not rise to the level of a crime. *State* v. *Brocuglio*, supra, 794.

[10] General Statutes § 53a-20 provides in relevant part: "A person in possession or control of premises . . . is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of a criminal trespass by such other person in or upon such premises . . . ."

[11] General Statutes § 53a-167c (a) provides in relevant part: "A person is guilty of assault of public safety . . . personnel when, with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is acting in the performance of his or her duties, (1) such person causes physical injury to such peace officer . . . ." Although § 53a-167c (a) was the subject of certain amendments in 2008; see Public Acts 2008, No. 08-150, § 54; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision.

lins, counsel for the state marshal commission (commission), had told him that Orr's personnel file contained seven to ten complaints but that she was not at liberty to reveal their substance. Defense counsel stated, however, that he believed the two most recent complaints filed in January and February, 2007, were extremely important because they *"may or may not* be relevant" in determining whether Orr had "a motive, or [bias], or interest to . . . testify falsely . . . ." (Emphasis added.) Counsel further stated that the complaints concerned bank executions in which Orr allegedly had handled or disbursed funds inappropriately and that "the issues of relevancy go to [Orr's] motive to testify falsely, whether or not he has bias or he has some motive, specifically a financial motive here in this particular case. There *may* also be some information in these particular files [*of*] *which I'm not aware* . . . because they're sealed, as to . . . whether or not [Orr] has in the past acted within . . . his duty as a state marshal." (Emphasis added.) Counsel reminded the court that a principal issue in the case was whether Orr had crossed the threshold of the defendant's home when serving the subpoena and that, if he had, he could not have been acting within the scope of his lawful duties. Relying on *State* v. *Januszewski*, 182 Conn. 142, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), overruled in part on other grounds by *State* v. *Ray*, 290 Conn. 602, 966 A.2d 148 (2009), counsel contended that, at the very least, the defense had "[a] right to . . . have the court conduct an in camera review of the seven to ten complaints to see if there is, in fact, any prior complaint which mirrors or is substantially similar to the defense that we're trying to raise here in this particular case . . . . It would show a propensity for [Orr] to enter the dwelling, that he had on previous occasions . . . in fact done that, and he would in fact be acting outside the scope

of his lawful duties." In short, counsel argued that the file might contain records showing that Orr had a financial stake in completing service or that he had crossed the threshold or assaulted someone else in the course of serving process, which would demonstrate that he had engaged in previous inappropriate activity as a public safety officer. Defense counsel conceded, however, that because he was not familiar with all of the file's contents, he "[could not] really make an argument of relevancy" other than the arguments he already had made.

The court responded that the defense was required to demonstrate independent knowledge of the contents of the files before they could be released, and questioned whether this had been done. Counsel replied that he would introduce material showing that Orr's testimony was biased or prejudicial, again explaining that Orr had a financial stake in crossing the threshold of the defendant's home because he would collect a fee for completing service that could be used to reimburse the trustee accounts from which he purportedly had misappropriated funds. Counsel also stated that he had information that Orr was "seeking some type of financial compensation for the [assault]. I clearly think that that's relevant, specifically if in fact the claim is that in late January, early February, he's misappropriated or taken money out of an account . . . for which he has an obligation under the law to put that money back. . . . [I]t just so happens that now, three weeks later, now we have an opportunity for him to, quote/unquote, have a payday here and to reimburse that—to find a way by which to reimburse that money into that account. That may be relevant . . . to some of the issues here that we have in the case." Counsel later added that, "if there's another proceeding . . . [concerning] whether or not [Orr] may have testified truthfully . . . it goes to [the] issue of [Orr's] truthfulness

. . . which is clearly an issue of credibility for which I have the right to cross-examine him. This isn't some open-ended fishing expedition. I think that there are records here, which clearly are going to be relevant to the issues of [Orr] testifying in this case."

The court denied the motion without conducting an in camera inspection of the file on the ground that the law was unclear regarding a state marshal's right to enter a person's property for the purpose of serving a subpoena and that counsel had failed to make a threshold showing that the file might contain information that was relevant to the issues in the case.

Following commencement of the trial, the defendant testified that Orr had crossed the threshold of his home without his permission when serving the subpoena, thus becoming a trespasser. The defendant specifically testified that, on the evening of the assault, he had been lying naked on the sofa with his eyes closed when he heard a tapping noise on the window, but that he did not open his eyes when he heard the noise because he was not feeling well. Shortly after the tapping ceased, he felt a nudge and heard a man, later identified as Orr, yelling "you've just been served . . . ." When the defendant opened his eyes, he saw a figure in dark clothing standing over him "like Dracula." The figure then suddenly turned around and started running toward the door. The defendant yelled, "who the hell are you" and chased the man, overtaking him as he reached the threshold of the doorway. Despite the fact that the man was in full retreat, the defendant pushed him from behind, telling him to "get the hell out of [his] house" and demanding identification. The man fell facedown on the porch and, according to the defendant, did not identify himself as a state marshal until he got up and started to leave. The defendant testified that the following morning he discovered a $5 bill on the floor near the sofa where the man allegedly had thrown

it. Thereafter, during closing argument, the defense argued that Orr illegally had crossed the threshold of the defendant's home and that the defendant had acted justifiably in chasing Orr and pushing him out the doorway because the defendant had a statutory and common-law right to defend his premises against intruders.[12]

"We review a court's conclusion that a defendant has failed to make a threshold showing of entitlement to an in camera review of statutorily protected records, including police personnel records, under the abuse of discretion standard. . . . We must make every reasonable presumption in favor of the trial court's action. . . . The trial court's exercise of its discretion will be reversed only where the abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State v. Betances*, 265 Conn. 493, 506, 828 A.2d 1248 (2003).

With respect to the governing legal principles, it is well established that "public records generally are available pursuant to the Freedom of Information Act [act], General Statutes § 1-200 et seq., [and that] the confidentiality of information in police personnel files that may be relevant to a witness' credibility is protected by General Statutes § 1-210 (b) (2)." (Internal quotation marks omitted.) Id. "The general rule under the [act] favors disclosure and exceptions to that rule will be narrowly construed in the light of the underlying purpose of the act. . . . [When] the . . . request . . .

---

[12] The defendant's testimony that Orr entered his home illegally and that the defendant pushed Orr out the doorway as Orr reached the threshold was generally consistent with the defendant's statement to Timothy A. Larkin, one of several officers dispatched to investigate Orr's complaint. Larkin's incident report quotes the defendant as stating that " 'some guy with white hair' " entered his home uninvited while the defendant was sleeping naked on the sofa, that the man poked him in the back and told him he was served, and that, after the defendant got up, he started yelling at the man, chased him to the doorway and pushed him from behind as he exited.

implicates . . . the right of a criminal defendant to impeach the witnesses who testify against him . . . [the] right of [the] particular defendant . . . must be weighed . . . [to determine] whether information, otherwise exempt under the act, must nevertheless be disclosed.

"The competing interests . . . are both weighty and legitimate. There are strong policy reasons for maintaining the confidentiality of personnel files . . . . Generally, a trial court has some discretion in the matter of discovery where material is sought for impeachment purposes. . . . Other jurisdictions have recognized that in the exercise of that discretion the trial court must weigh the defendant's need to examine confidential matter for the purpose of discovering impeaching material against the public policy in favor of the confidentiality of private and personal information. . . . We subscribe to this approach.

"The disclosure of such information must be carefully tailored to a legitimate and demonstrated need for such information in any given case. Where disclosure of the personnel file would place in the hands of a defendant irrelevant or personal and sensitive information concerning the witness, the entire file should not be disclosed. No criminal defendant has the right to conduct a general fishing expedition into the personnel records of a [state marshal]. Any request for information that does not directly relate to legitimate issues that may arise in the course of the criminal prosecution ought to be denied. In recognizing the danger of permitting the disclosure of personnel records of any witness or litigant, one court has said: It has been widely noted that such records often contain raw data, uncorroborated complaints, and other information which may or may not be true but may be embarrassing, although entirely irrelevant to any issue in the case, even as to credibility. *People* v. *Sumpter*, 75 Misc. 2d 55, 60, 347 N.Y.S.2d 670

(1973). Because discovery of matters contained in a [state marshal's] personnel file involves careful discrimination between material that relates to the issues involved and that which is irrelevant to those issues, the judicial authority should exercise its discretion in determining what matters shall be disclosed. An in camera inspection of the documents involved, therefore, will under most circumstances be necessary. . . . We reemphasize that, in resolving requests for disclosure, routine access to personnel files is not to be had. Requests for information should be specific and should set forth the issue in the case to which the personnel information sought will relate. The trial court should make available to the defendant only information that it concludes is clearly material and relevant to the issue involved. . . . In this regard, the trial court should exercise its discretion in deciding the temporal relevancy or remoteness of material sought. . . . Because the law furnishes no precise or universal test of relevancy, the question must be determined on a case by case basis according to the teachings of reason and judicial experience." (Citations omitted; internal quotation marks omitted.) *State* v. *Januszewski*, supra, 182 Conn. 170–73.

We have further explained that, "[w]ithin the law of evidence, relevance is a very broad concept. Evidence is relevant if it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. Conn. Code Evid. § 4-1. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All

that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 496–97, 964 A.2d 73 (2009).

Our reasoning in *State* v. *Betances*, supra, 265 Conn. 505–508, in which this court reviewed a similar claim, is instructive. In *Betances*, following his conviction of, inter alia, possession of narcotics with intent to sell, the defendant argued on appeal to this court that the trial court improperly had denied his request for an in camera inspection of the arresting officer's personnel file to determine if it contained any relevant material that the defendant could have used in his cross-examination of the officer. Id., 505. The state countered that the trial court had been correct in determining that the defendant had not provided an adequate factual basis for his request because he had not referred to specific information in the file that was relevant and material to the issues in the case, and this court agreed. Id., 506. We thus upheld the trial court's ruling on the ground that "the defendant's request for information . . . was not specific and did not sufficiently set forth the issue in the case to which the information sought would relate." Id., 507. The defendant had sought transcripts of any radio communications to and from the officer on the evening of the arrest and other information that might have shed light on whether the officer had "a problem effectuating legal arrests . . . ." (Internal quotation marks omitted.) Id., 507–508. The defendant also had argued that he would "like to see if there is a question as to [the officer] harassing potential arrestees" by "requiring that [they] either . . . snitch or face arrest"; and that "he considered his arrest to be retaliatory and . . . was concerned about the number of alleged inconsistencies in [the officer's] testimony at the suppression hearing." (Internal quotation marks

omitted.) Id., 508. We observed, however, that the defendant had not contended that the officer had planted the narcotics in question on him and that the defendant had adduced no evidence suggesting that the officer had done so to other persons in the past. Id. Accordingly, we concluded that the trial court properly had determined that there was an insufficient nexus between the information requested in the officer's personnel files and the defendant's prosecution and that the defendant merely wanted to conduct a " 'fishing expedition . . . .' " Id.

In the present case, the defendant claims that Orr's credibility was a key issue because "[t]he jury must have accepted . . . Orr's version of the facts since [the defendant] was found guilty. . . . There was no other corroborating evidence of [Orr's] claims." The defendant thus contends that "[t]he state's entire case hinged on the credibility of . . . Orr" with respect to his testimony that he did not cross the threshold and that "[t]he case rose and fell on the jury's determination of . . . Orr's truth and veracity. Any evidence that would have a tendency to show that . . . Orr was untruthful should have been allowed by the trial court." We conclude that the trial court did not abuse its discretion in denying the defendant's motion to disclose or to conduct an in camera inspection of Orr's personnel file.

Insofar as the defendant requested information regarding the two most recent complaints alleging that Orr had misappropriated funds, the request was specific but there was "an insufficient nexus between the information requested and the defendant's prosecution . . . ." *State* v. *Betances*, supra, 265 Conn. 508. The gravamen of a misappropriation complaint is the unauthorized or improper taking of funds or other property for a purpose other than that for which it was intended. See Black's Law Dictionary (6th Ed. 1990) (defining "[m]isappropriation of a client's funds" as "any unauthorized use of [a] client's funds entrusted to an attor-

ney, including not only stealing but also unauthorized temporary use for [the] lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom"). Thus, if the defendant had claimed that Orr had collected a fee for serving him without making service, the required nexus arguably might have been demonstrated, because the basis for such a claim would have been the improper taking of state funds by Orr that were not his to take. The defendant, however, did not make that claim, but, rather, advanced the claim that Orr improperly had served the subpoena by crossing the threshold of the defendant's home. Consequently, there was no connection between the substance of the alleged misappropriation complaints and the defendant's claim that Orr improperly had crossed the threshold when he served the subpoena.[13]

The defendant's attempt to explain the relevancy of the complaints by suggesting that Orr had crossed the threshold because he needed the fee for making service to reimburse his depleted trustee account does not cure this defect because the explanation was based on pure speculation and was totally lacking in evidentiary support. The defense did not indicate in its offer of proof how much money allegedly had been misappropriated, whether the fee for making in-hand service would have restored, or come close to restoring, the trustee account to its proper balance or whether the purported misappropriation complaints had been investigated and found to be valid. Thus, the defense provided the court with no basis for assuming that the magnitude of the fee for making in-hand service was such that it could have provided Orr with sufficient motivation to cross the threshold of the defendant's home to ensure that service

[13] We thus do not reach or address the question of whether a public safety officer acts in violation of § 53a-167c (a) (1) when the officer crosses the threshold of a person's home without being invited in the course of serving a subpoena.

would be made.[14] The defendant's claim that the misappropriation complaints were also relevant to Orr's financial motive to testify untruthfully because Orr needed the criminal conviction to ensure his success in a potential civil action against the defendant that would provide him with funds to repay his trustee account suffered from a similar lack of evidentiary support regarding whether, and to what degree, Orr was actually in debt. In other words, the defendant's offer of proof contained no factual assertions to support his various theories as to why the misappropriation complaints were relevant. Finally, defense counsel's request for disclosure of the misappropriation complaints was qualified by his own uncertainty as to their relevance, which was revealed when he admitted that the complaints "may or may not be relevant" in determining whether Orr had "a motive, or [bias], or interest to . . . testify falsely" regarding whether he had crossed the threshold of the defendant's home.

To the extent defense counsel argued that the files might contain information showing Orr's propensity to cross the threshold when making service in other cases, the request was lacking in specificity and constituted the type of fishing expedition that the law seeks to avoid. Counsel admitted that he did not know the substance of the complaints, other than the two complaints alleging misappropriation of funds, and thus could only argue that "[t]here *may* . . . be some information in these particular files [*of*] *which I'm not aware* . . . because they're sealed, as to . . . whether or not [Orr]

[14] At trial, the defense provided the court with additional facts pertaining to this issue when making an offer of proof for the purpose of cross-examining Orr on the misappropriation complaints. See part I B of this opinion. We cannot impute to the trial court, however, or consider on appeal knowledge that the trial court did not have when ruling on the motion to disclose prior to commencement of the trial. See *State* v. *Provost*, 251 Conn. 252, 261–62, 741 A.2d 295 (1999), cert. denied, 531 U.S. 822, 121 S. Ct. 65, 148 L. Ed. 2d 30 (2000).

has in the past acted within . . . his duty as a state marshal." (Emphasis added.) See *State* v. *Betances*, supra, 265 Conn. 507–508 (rejecting as " 'fishing expedition' " defendant's request to disclose information in police officer's personnel files to see if officer had " 'a problem effectuating legal arrests' " or whether " 'there is a question as to [the officer] harassing potential arrestees' "). Counsel later added that he had "[a] right to . . . have the court conduct an in camera review of the seven to ten complaints *to see if there is, in fact, any prior complaint which mirrors or is substantially similar to the defense that we're trying to raise here* . . . . It would show a propensity for [Orr] to enter the dwelling . . . outside the scope of his lawful duties." (Emphasis added.) Indeed, counsel expressly conceded that, because some of the file's contents were sealed and he did not know what other information the file might contain, he could make no further arguments as to the relevancy of the information he sought to have disclosed. Accordingly, counsel had no independent knowledge that the file contained records indicating that Orr had crossed the threshold when serving process in other cases, and we conclude that the trial court, which has broad discretion in making evidentiary rulings that we do not disturb except where abused or where injustice appears to have been done; see *State* v. *Betances*, supra, 506; properly denied the defendant's request to disclose or to conduct an in camera inspection of Orr's personnel file.

The defendant argues that this court stated in *Januszewski* that an in camera inspection is necessary in most circumstances to determine if the requested files are relevant. In *Januszewski,* however, unlike in the present case, the defendant sought permission to inspect the personnel file of the arresting officer *"to verify knowledge, based on information and belief,"* that the officer had been the subject of various disciplin-

ary actions prior to the incident in question. (Emphasis added.) *State* v. *Januszewski*, supra, 182 Conn. 170. We also determined in *Januszewski* that the trial court's denial of an in camera inspection was harmless error because the defendant could have impeached the officer's credibility in other ways, such as calling witnesses to testify regarding the officer's reputation for truth and veracity, cross-examining the officer concerning prior disciplinary proceedings regarding his truth and veracity in a similar context, deposing the officer and his superiors prior to the trial or filing other motions for discovery concerning the officer's credibility. Id., 174–75. In the present case, information in the file concerning the misappropriation of funds was lacking in relevance, and, insofar as counsel sought information that Orr had a propensity to cross the threshold when making in-hand service at a person's residence, counsel's request was lacking in specificity because he had no information or knowledge of prior complaints or disciplinary actions regarding Orr's alleged crossing of the threshold when making similar service. Accordingly, we conclude that the defendant's claim has no merit.

### B

The defendant next claims that the trial court improperly denied him an opportunity to cross-examine Orr in violation of his constitutional rights of confrontation and to present a defense. He specifically claims that the trial court should have allowed him to impeach Orr's credibility by cross-examining him regarding the two complaints allegedly made against him in January and February, 2007, for mishandling funds in his trustee account. The defendant contends that the complaints would have shown that Orr was undergoing financial difficulty at the time of the incident and that he was so desperate to collect the fee for serving the subpoena at the defendant's home that he illegally crossed the

threshold to ensure that service would be made. The defendant also claims that the trial court should have allowed him to impeach Orr's credibility by asking him directly whether he had a financial stake in the outcome of the case. The state responds that there is no constitutional violation and, accordingly, the court did not abuse its discretion in limiting defense counsel's cross-examination of Orr. We agree with the state.

The following additional facts are relevant to our resolution of this claim. The day after the court denied defense counsel's request to disclose or to conduct an in camera inspection of Orr's personnel file, the trial commenced and counsel informed the court that he intended to query Orr about certain public records contained in the file and would make an offer of proof at that time. Thereafter, Orr appeared as a witness for the state. On cross-examination, defense counsel asked Orr a series of questions regarding his fee for making in-hand service on the defendant and Orr explained that, although he did not recall exactly what he was paid, his fee was usually $30 plus a certain amount for mileage, $1 for each page of the document served and forty cents for the endorsement stamp. Orr further testified that he was not paid until he made actual physical service, which is what he had been requested to do in this case. Counsel then asked that the jury and Orr be excused so that counsel could discuss certain matters with the court.

After the jury and Orr left the courtroom, defense counsel stated that he wanted to query Orr concerning the two misappropriation complaints. Counsel stated that, on the basis of his conversations with the commission's attorney, Collins, as well as certain documents that he had seen, he believed that Orr had been asked to conduct two bank executions and a property execution, that he had placed the funds he received from the executions in his trustee account and that approximately

$7000 had been removed from the account by Orr's wife without appropriate permission. Counsel also stated that Orr had bounced multiple checks and had failed to pay in a timely fashion the two attorneys who had retained him to conduct the executions. He further stated that there had been a finding of probable cause that Orr had mishandled funds on behalf of his clients by not following the appropriate accounting procedures. Counsel thus argued that Orr had a financial motive to testify untruthfully about crossing the threshold because he was desperate to obtain the $150 or $200 he would receive for making successful service on the defendant. He argued, in addition, that the misappropriation complaints were relevant because Orr could obtain a windfall if he won in a subsequent civil action against the defendant and that he intended to ask Orr if he was still $4000 to $7000 in debt. The prosecutor countered that Orr's testimony on the misappropriation complaints was not relevant because Orr had explained that he had been told by the authorities to make in-hand service of the subpoena and, in any event, he would not reap a large financial gain from completing service. The prosecutor contended that such testimony might be relevant only if Orr had been making a bank execution rather than making ordinary in-hand service of a subpoena. Defense counsel responded that he had a right to impeach Orr's testimony by specific acts of conduct and that the misappropriation information was relevant.

The court ultimately ruled to preclude cross-examination of Orr on the misappropriation complaints. The court noted that, although the complaints had resulted in a probable cause finding, there had been no adjudication of the matter. The court also stated that the misappropriation issue was too remote and irrelevant to allow the cross-examination because the present case was

predicated on assault or interfering with an officer, and was not a case involving money or banking issues.

After the jury and Orr returned to the courtroom, defense counsel queried Orr regarding his training and duties as a marshal and what he had said to the defendant, both when he left the premises and as represented in his statement to the police. Counsel then asked Orr if he had a financial stake in the outcome of the case. The state objected to the question, but, before the court could respond, Orr replied that he had been paid for serving the subpoena. The state again objected and the court sustained the objection for lack of a foundation. The court then ordered the jury to leave the courtroom a second time and the defense made an offer of proof.

Counsel first explained that he wanted to elicit testimony that Orr had a financial stake in the outcome of the defendant's criminal case because Orr allegedly had consulted with an attorney and intended to bring a civil action against the defendant following the criminal proceeding. Counsel then queried Orr directly and asked if he planned on bringing such an action against the defendant. Orr responded that, although he had spoken to two or three attorneys "about [the] case in general," he had not "done anything in that direction yet." He further stated: "I think I would be entitled to but I haven't started anything yet." On the basis of this testimony, defense counsel argued that a potential civil action by Orr was relevant to his bias or interest in the outcome of the criminal case. The court, after noting Orr's testimony that he had not filed a civil action, granted counsel permission to ask Orr in the jury's presence if he intended to file one.

After the jury returned to the courtroom and cross-examination continued, counsel asked Orr if he intended to file a civil action upon completion of the criminal case and Orr responded that he had not

decided. Upon further questioning, Orr explained that he had spoken to three different attorneys, each of whom had advised him that he would be entitled to do so, but that he had taken no steps in that direction. When counsel then asked if Orr would agree that he had a financial stake in the outcome of the case and "need[ed]" a conviction in the criminal case, the court sustained the state's objection and Orr did not answer.

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . As an appropriate and potentially vital function of cross-examination, exposure of a witness' motive, interest, bias or prejudice may not be unduly restricted. . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . [P]reclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . Further, the exclusion of defense evidence may deprive the defendant of his constitutional right to present a defense. . . .

"However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the exis-

tence of [other facts] either certain or more probable. . . . [Furthermore, the] trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . [Finally, the] proffering party bears the burden of establishing the relevance of the offered testimony. . . .

"Although [t]he general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. . . . The defendant's right to cross-examine a witness, however, is not absolute. . . . Therefore, a claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion . . . .

"Accordingly, we first must determine whether the . . . cross-examination . . . met the minimum constitutional standards required by the sixth amendment. The defendant's constitutional right to cross-examination is satisfied [w]hen defense counsel is permitted to expose to the jury the facts from which it appropriately can draw inferences relating to the reliability of the

witness . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 273 Conn. 330, 338–40, 869 A.2d 1224 (2005).

In the present case, we conclude that the defendant was not deprived of a meaningful opportunity to cross-examine Orr regarding the two misappropriation complaints for the same reasons we concluded that the trial court properly denied the defendant's motion to disclose the contents of Orr's personnel file. As the trial court explained, the complaints were not relevant to the issues in the case because the case did not involve money or banking issues, and, insofar as the defendant speculated that financial difficulties had motivated Orr to cross the threshold to ensure that service was made, the defendant provided no reasonable evidence to support that assertion. Orr testified that he had been asked to make in-hand service on the defendant, and, therefore, his job required him to do so. In addition, it hardly makes sense that the $30 fee he received for completing service, plus a few dollars more for mileage and other expenses, would have motivated Orr to take the possibly illegal step of crossing the threshold of the defendant's home when he allegedly needed several thousand dollars to replenish his trustee account. See footnote 14 of this opinion. Insofar as Orr's possible indebtedness might have served as a motive to testify untruthfully, the court subsequently allowed the defense to cross-examine Orr as to whether he was considering a civil action against the defendant, which provided the jury with more than sufficient information on which to conclude that Orr had a motive to testify falsely in the criminal trial. Accordingly, we conclude that there was no violation of the defendant's constitutional right of confrontation on the ground that the trial court did not allow him to cross-examine Orr on the misappropriation complaints.

We also conclude that the defendant was not deprived of his constitutional rights of confrontation and to present a defense when the court ruled that he could not ask Orr if he had a financial stake in the outcome of the case. "Although it is within the trial court's discretion to determine the extent of cross-examination and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment." *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). "It is . . . generally accepted that the pendency of a civil claim arising out of the same set of circumstances as those that served as the basis for a criminal prosecution is probative of a prosecuting witness' motive to lie because the outcome of the prosecution may be beneficial to the prosecuting witness." *State* v. *Arline*, 223 Conn. 52, 61, 612 A.2d 755 (1992).

In the present case, the court allowed the defense to query Orr as to whether he intended to file a civil action. Defense counsel also elicited testimony that Orr had been informed by three different attorneys that he was entitled to file an action but that he had not yet decided whether to do so.[15] In light of the fact that the court permitted the defense to ask Orr if he had received legal advice regarding a civil action and whether he intended to bring one, and that Orr answered both questions in a straightforward manner, we conclude that the defendant was "permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact

[15] We note that defense counsel asked Orr two different times in the presence of the jury if he had a financial stake in the outcome of the case, both before the jurors left the courtroom and after they returned. Thus, the defense was able to suggest that Orr had a financial stake in the outcome of the case, despite the trial court's ruling.

and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 273 Conn. 341. In other words, the jury could have presumed that Orr would bring a civil action and thus had an interest in the outcome of the criminal case on the basis of his answers to these questions, just as easily as it could have so presumed on the basis of Orr's potential answer to the question of whether he had a financial stake in the outcome of the case. Accordingly, the defendant's constitutional claims have no merit and the trial court did not abuse its discretion in limiting the cross-examination of Orr on the foregoing matters.

C

The defendant's final claim with respect to his conviction of assault of public safety personnel is that the trial court abused its discretion when it precluded him from eliciting testimony from a third party witness, Charles Wade, regarding Orr's attempt to serve process at the defendant's home five days prior to the assault. The defendant claims that the trial court improperly concluded that (1) Wade's proposed testimony was unclear as to whether Orr had entered the defendant's home illegally during his prior attempt to serve process and, therefore, Wade's testimony would not support the defendant's theory that Orr was not acting in the official performance of his duties on the night of the assault, and (2) the testimony would unduly confuse the jury. The state replies that the proposed testimony was insufficiently probative of the issues in this case as to be relevant and admissible. We agree with the state.

The following facts are necessary to our resolution of this claim. On direct examination, Orr referred two or three times to the fact that he had made several prior unsuccessful attempts to serve the defendant with papers, but did not go into any details. On cross-exami-

nation, however, the defense asked Orr directly if he had attempted to serve the defendant at his residence prior to the evening in question, and Orr responded that he had. The defense subsequently asked, over the state's objection, if Orr had ever entered the house on any previous occasion and Orr responded that he had gone to the kitchen door one other time and had rapped on the door with his flashlight. Orr further testified on cross-examination that the door had opened as a result of his rapping and that, after he stepped onto the threshold and called out the defendant's name, a man who was not the defendant walked into the room and approached him. Orr also testified that he was standing on the threshold the entire time and did not go inside the residence.

Thereafter, the defense called Wade, a longtime friend of the defendant, to testify about this prior incident. When defense counsel started to ask Wade about Orr's attempt to serve the defendant, the state objected on the ground of relevance and the court excused the jury so that the defense could make an offer of proof. During the voir dire, Wade stated that on March 4, 2007, five days before the assault, he went to the defendant's house—where the defendant operated a garbage and sanitation hauling business—to order another trash dumpster and to pay a bill, and that he remained in the house after the defendant left to get something to eat. A few minutes later, before the defendant returned, Wade heard someone knocking on the kitchen door. When the knocking persisted, he went to find out who it was. As he approached the kitchen, he heard someone call out the defendant's name and, upon entering the room, saw a man "standing there with the door open . . . ." The man, later identified as Orr, asked if Wade was the defendant. Wade replied that he was a friend and that he did not know where the defendant was or when he would return. The man then explained that he

was there to serve the defendant with some papers and would return the next day. In response to further questioning as to where the man was standing, Wade testified that he was standing "[i]n the kitchen in the doorway." When asked if his feet were inside the kitchen itself, Wade replied that "[h]e was standing in the kitchen, in the door." The defense then informed the court that it had completed its offer of proof.

The state argued that Wade's testimony was not relevant to what had occurred five days later on the evening of the assault. The defense countered that the testimony was relevant to the affirmative defenses of defense of premises and whether Orr was lawfully performing his duties when he entered the defendant's home. The defense also reminded the court that Orr already had testified that he had been to the defendant's home on a previous occasion when attempting to serve the subpoena and that Orr had not crossed the threshold at that time. The defense maintained that it had a right to rebut the testimony Orr had given as to whether he had remained on the threshold during the prior attempt to serve the defendant and that the facts regarding the prior attempt were important for the jury to hear in assessing Orr's credibility with respect to the present incident. Following a brief discussion with counsel, the court sought further information from Wade to determine where the man was standing during their conversation.

When defense counsel asked directly where the man was standing, Wade stated that, to "[b]e honest with you, I don't know how far in the door he was standing or in the kitchen but the door was open . . . and he was standing." The court, still dissatisfied, stated that the testimony as to what had occurred on March 9 was clear, in that the defendant had stated that Orr had entered the house, whereas Wade's testimony regarding the March 4 conversation was unclear as to whether

the man had crossed the threshold. The court, therefore, concluded that his testimony would confuse the jury. The court also concluded that what had occurred on March 4 was not relevant with respect to what had occurred on March 9 because "it's much clearer as to what the parameters were on the March 9 date as opposed to the March [4] date." The trial court thus sustained the state's objection to the proffered testimony.

At defense counsel's request, however, the court agreed to hear further argument. Counsel again contended that the state's direct examination of Orr had elicited his version of what had occurred on March 4, and that the defense had a right to contradict that testimony. Counsel also argued that the testimony was relevant to the issue of whether Orr had a common plan, design, scheme or practice of entering houses illegally to make in-hand service. The court then elicited additional testimony from Wade in which Wade stated that when he reached the kitchen he was roughly five or six feet away from the man, who was standing "[i]n the doorway." When the court asked what Wade meant by the "doorway"—was the man in the actual entrance, or how far away from the entrance was he standing— Wade replied, "[a] foot." Wade also testified that the man never moved inward from the place where he was standing.

After the court finished questioning Wade, defense counsel showed Wade a cord that represented a hypothetical door jamb and asked him whether the man was standing on the door jamb. Wade replied, "I believe he [was] in another foot." Wade further explained that the man was inside the kitchen "but not that far." When pressed again by counsel as to whether he was in the kitchen, Wade again said, "I believe so, yes." After noting that Wade could only say, "[h]e believes so . . . [h]e believes so," to which Wade replied, "[y]es, Your

Honor," the court stated that counsel had been leading Wade and ruled the proffered testimony inadmissible.

Reviewing the defendant's claim under the same evidentiary principles described in parts I A and B of this opinion, we conclude that the trial court did not abuse its discretion in precluding Wade's testimony regarding Orr's prior attempt to serve process on the defendant. The testimony would have been useful only to the extent that it suggested a pattern of entering a home illegally to make service of process similar to the defendant's description of the manner in which Orr had entered his home on the evening of the assault. Wade's testimony, however, would have been confusing to the jury for two reasons. First, he could not precisely recall exactly whether Orr had stepped into the kitchen and, if so, how far he was from the door, repeatedly stating that Orr was in the doorway and only testifying that he "believe[d]" Orr might also have stepped just inside the doorway. Moreover, even if Wade had recalled more clearly that Orr had stepped inside the kitchen, his testimony was so markedly different from the defendant's testimony that Orr had walked inside the room, nudged the defendant while he was sleeping and thrown the subpoena and the money on the floor that it bore no resemblance to Wade's description of what had happened five days earlier. Consequently, Wade's testimony, even when construed in a manner most favorable to the defendant, did not tend to support, even to a slight degree, the defendant's version of how Orr had served the subpoena on the night of the assault.

In addition, defense counsel's argument that he had a right to contradict Orr's testimony on direct examination about what had happened when Orr attempted to serve the subpoena on March 4 incorrectly represented how Orr's testimony on the matter was presented to the court. In actual fact, Orr merely made the general statement on direct examination that he had attempted

to serve the defendant on prior occasions, and it was defense counsel who queried Orr on cross-examination, *over the state's objection,* as to the details of what had happened when he went to the defendant's home on March 4, and encountered Wade at the kitchen door. Thus, having elicited all of the testimony concerning Orr's encounter with Wade during the cross-examination, defense counsel was not deprived of an opportunity to challenge Orr or to question him more directly regarding any aspect of the encounter. We therefore conclude that the trial court properly precluded Wade's testimony on grounds of vagueness and irrelevance.

## II

We now turn to the defendant's claims insofar as they pertain to his conviction of assault of an elderly person. At trial, the defendant raised the affirmative defenses of self-defense, the common-law right to resist entry and defense of premises. A precondition to each defense is a reasonable belief by the threatened person in the necessity of resisting the imminent use of force against him or a refusal by the trespasser to leave the premises. As previously noted, however, the defendant testified that, although Orr crossed the threshold of his home when he served the subpoena, Orr was leaving voluntarily when the defendant pushed him from behind and caused him to fall. See part I A of this opinion. Accordingly, because the defendant's version of the facts, if accepted, fails to support any of the foregoing defenses, we conclude that his claims have no merit with respect to the assault of an elderly person conviction and we summarily reject them.

The judgment is affirmed.

In this opinion ROGERS, C. J., and NORCOTT, PALMER, VERTEFEUILLE and McLACHLAN, Js., concurred.

KATZ, J., concurring. Although I agree with the majority that the judgment of conviction of the defendant, Earl Martin Erickson, must be affirmed, I write separately because I disagree with the majority's conclusion in part I A of its opinion that the trial court properly declined to conduct an in camera review of documents regarding complaints of misappropriation in the personnel file of the complainant, Richard Orr, a state marshal. Instead, I would conclude that the defendant adequately demonstrated that there was a reasonable likelihood that the personnel files contained material relevant to Orr's credibility as a witness and that the defendant was therefore entitled to have the trial court review those documents to determine whether they should be disclosed to him. My independent review of the documents, however, reveals that any impropriety on the part of the trial court was harmless and thus does not necessitate reversal.

The defendant contends that the trial court improperly refused to conduct an in camera review of two groups of documents allegedly present within Orr's personnel file: (1) seven to ten complaints made against Orr in his capacity as a state marshal; and (2) complaints made against Orr on January 16, 2007, and February 2, 2007, for the alleged misappropriation of funds in Orr's trustee account (misappropriation complaints). As to the first group of documents, the majority concludes that the trial court properly declined to conduct an in camera review because the defendant had failed to provide any specific basis to believe that the records would contain prior complaints or disciplinary actions bearing on the defendant's case. As to the second group of documents, the misappropriation complaints, the majority concludes that the trial court acted properly in refusing to conduct an in camera review because the defendant had failed to establish that Orr's prior misappropriation of funds was relevant. I agree with

the majority as to the first group, but respectfully disagree as to the second.

When a criminal defendant requests disclosure of confidential information or records, a trial court may be called upon to perform an in camera review in order to determine the contents of those records and to balance the defendant's interest in disclosure of the records against the strong policy interests in confidentiality. See *State* v. *Januszewski*, 182 Conn. 142, 172–73, 438 A.2d 679 (1980) ("Because discovery of matters contained in a police officer's personnel file involves careful discrimination between material that relates to the issues involved and that which is irrelevant to those issues, the judicial authority should exercise its discretion in determining what matters shall be disclosed. An in camera inspection of the documents involved, therefore, will under most circumstances be necessary."), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), overruled in part on other grounds by *State* v. *Ray*, 290 Conn. 602, 966 A.2d 148 (2009). In order to warrant such review, however, a defendant's request for information must "be specific and should set forth the issue in the case to which the personnel information sought will relate. . . . Any request for information that does not directly relate to legitimate issues that may arise in the course of the criminal prosecution ought to be denied." (Citation omitted; internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 507, 828 A.2d 1248 (2003). Accordingly, a trial court's refusal to conduct an in camera review of documents or records constitutes an abuse of discretion only when "a sufficient foundation has been laid [by the defendant] to indicate a reasonable likelihood that they contain material relevant to the case or useful for impeachment of a witness." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 264, 864 A.2d

666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

In *State* v. *Januszewski,* supra, 182 Conn. 173–74, this court noted: "It seems to us that in this case, where the defendant's right to impeach the state's key witness is involved, an in camera inspection by the trial judge of the witness' personnel file for material relevant to the issue of credibility would have been appropriate. The trial court's refusal to do so constituted error." Indeed, we have emphasized that "[e]vidence tending to show the motive, bias or interest of an important witness is never collateral or irrelevant. It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Internal quotation marks omitted.) *State* v. *Colton,* 227 Conn. 231, 248, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). Accordingly, "[i]mpeachment of a witness for motive, bias and interest may . . . be accomplished by the introduction of extrinsic evidence." Id., 249. Moreover, "[i]nquiry into a possible financial stake of a witness in the outcome of a case in which the witness is testifying is a proper subject of impeachment." Id., 250.

During his proffer regarding the personnel records, the defendant contended that the misappropriation complaints would demonstrate that Orr needed money to replenish his trustee account. He further claimed that Orr's financial status, as demonstrated by the misappropriation complaints, was relevant to show that: (1) Orr had a motive to cross the threshold of the defendant's residence in order to collect his fee for effectuating service; and (2) Orr had a motive to testify at trial that he had not crossed the threshold of the defendant's residence in order to bolster a potential civil action

against the defendant.[1] As to the first ground, I agree with the majority that the defense failed to establish a meaningful nexus between the misappropriation complaints and Orr's actions at the time of the incident. Specifically, I agree with the majority that, because the defendant provided no information as to what extent the fee for making in-hand service would have restored the allegedly misappropriated funds, he failed to meet his burden to demonstrate the potential relevance of the requested materials. See *State* v. *Betances*, supra, 265 Conn. 507. As to the second ground, however, I conclude that the defense did lay a sufficient foundation to warrant an in camera review of the misappropriation complaints.

In the present case, Orr and the defendant testified to radically different versions of the confrontation underlying the charges filed against the defendant. Because there were no eyewitnesses in this case, other than Orr and the defendant, the outcome of the case essentially turned on which man the jury believed. The defendant's proffer established a nexus between records concerning the alleged misappropriation complaints, which could establish that Orr needed funds to

---

[1] In his proffer, defense counsel suggested that the misappropriation complaints would be relevant to whether Orr had "a motive, or vice, or interest . . . to testify falsely here in this case." Upon further questioning by the trial court regarding the relevancy of the documents, defense counsel first noted that, "if there was a financial stake, for which we believe that there was here, that [Orr] has some kind of monetary issue going on in the background here, that . . . certainly would be an issue of relevancy." Defense counsel then explained: "[W]e have information, that will be able to come out through cross-examination that this has been an exercise in seeking some type of financial compensation for the acts for which [Orr] claimed to have been hurt here. I clearly think that that's relevant, specifically if in fact the claim is that in late January, early February [2007], he's misappropriated or taken money out of an account, whether it be him or somebody else, for which he has an obligation under the law to put that money back. But it just so happens that now, three weeks later, now we have an opportunity for [Orr] to, quote/unquote, have a payday here and to reimburse that— to find a way by which to reimburse that money into the account."

replenish his trustee accounts, and his motive to testify falsely in order to enhance the likelihood of prevailing in any potential civil action against the defendant. The complaints were relevant to Orr's financial stake in the outcome of the case, and, accordingly, to his credibility as the state's key witness. See *State* v. *Colton,* supra, 227 Conn. 250. I therefore would conclude that the trial court abused its discretion by refusing to conduct an in camera inquiry of records related to the misappropriation complaints.

This conclusion, however, does not end my inquiry. Even if we were to assume that the trial court had conducted the in camera review, "the trial court [must] make available to the defendant only information that it concludes is clearly material and relevant to the issue involved. . . . In this regard, the trial court should exercise its discretion in deciding the temporal relevancy or remoteness of material sought. . . . Because the law furnishes no precise or universal test of relevancy, the question must be determined on a case by case basis according to the teachings of reason and judicial experience." (Internal quotation marks omitted.) *State* v. *Brown,* 273 Conn. 330, 347, 869 A.2d 1224 (2005). My independent review of the documents pertaining to the misappropriation complaints reveals that, in fact, Orr had repaid the trustee accounts in full well before both the incident in question and, therefore, the trial.[2] Accordingly, the requested documents *disproved*

---

[2] I note that, as a general practice, information contained in a confidential file should not be made public as part of appellate review without first giving the witness an opportunity to waive confidentiality. See, e.g., *State* v. *Webb,* 75 Conn. App. 447, 458, 817 A.2d 122 ("[w]e will not reveal specific details of the result of our in camera review because [on remand] the victim may withhold her consent to the disclosure of that additional material"), cert. denied, 263 Conn. 919, 822 A.2d 244 (2003). In the present case, however, this brief description of the contents of the file ameliorates any harmful effect of this court's necessary acknowledgment of the *existence* of the misappropriation complaints and inures exclusively to Orr's benefit.

the defendant's claim that Orr had a motive to testify falsely in order to rectify any arrearage of his trustee accounts, and therefore were not relevant to the defense.[3] Cf. *State* v. *Slimskey*, 257 Conn. 842, 857, 779 A.2d 723 (2001) (reversing judgment when "review of

[3] The defendant also claims that the trial court improperly prevented him from cross-examining Orr regarding the misappropriation complaints. During the proffer in support of this line of cross-examination, the defendant set forth additional facts concerning the alleged misappropriation complaints and claimed that the complaints were relevant as to Orr's motive to testify falsely in order to bolster a civil action against the defendant. Specifically, defense counsel stated: "Orr in his official capacity as a state marshal was asked to execute a bank execution and a property execution for which he then received funds into his state marshal trustee account. And those funds were . . . removed from his trustee account without the appropriate permission [by] his wife and he was some [$7000] negative in his state marshal account and began bouncing checks across the board; and failed to pay in a timely fashion to the two attorneys [who] had retained him to execute these two bank executions and property execution. They filed complaints with the [s]tate [m]arshal [c]omission; there's been a determination of finding of probable cause that he had mishandled funds on behalf of clients and that he had not filed the appropriate accounting provisions for a trustee account.

"Those issues are relevant as to the issues of motive, bias or . . . interest here to testify untruthfully, because there is a financial component that I intend . . . to get into a line of questioning with [Orr] in regards to whether or not he intends to bring a civil action for these injuries he sustained. . . .

"[T]his is potentially a windfall for [Orr] financially in terms of bringing a civil action, and I would intend to ask him whether or not he's still in debt some [$4000 to $7000]. And I think that he's got a financial motive here to testify untruthfully . . . ."

The trial court, however, misconstrued the defendant's claim as relating to Orr's motive to cross the threshold of the defendant's residence, and, based on that misconstruction, determined that any cross-examination about the misappropriation complaints would be remote and irrelevant. Specifically, the trial court stated: "This is an assault case, an interfering case, and the question is whether or not [Orr] was assaulted by [the defendant]. The fee that he would receive for this was . . . I think he testified . . . [$30] thereabout. This is not . . . [your] client's not on trial for a case where it involves money, funds, banking issues. So, I'm going to make the finding [that] it's irrelevant."

As we have noted previously herein, evidence tending to establish a witness' motive to testify falsely is relevant. *State* v. *Colton*, supra, 227 Conn. 250. The defendant's proffer clearly established his theory of relevance and how the evidence would tend to support that theory. See *State* v. *Cecil*, 291

the victim's school records, viewed in conjunction with the entire trial transcript, convinces us that portions of the . . . reports directly relate to [the victim's] credibility and could have created a reasonable doubt of the defendant's guilt"). Nor were they relevant to any other issue implicated in this case.

Accordingly, I concur in the judgment.

Conn. 813, 825, 970 A.2d 710 (2009) ("[a] clear statement of the defendant's theory of relevance is all important in determining whether the evidence is offered for a permissible purpose"). Accordingly, I would conclude that the trial court abused its discretion in preventing the defendant from cross-examining Orr regarding the misappropriation complaints. I also would conclude, however, that the contents of the documents pertaining to those complaints renders any impropriety harmless. See footnote 2 of this opinion.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.