## STATE OF CONNECTICUT *v.* MARK R.*
## (SC 18593)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan and Vertefeuille, Js.

* In accordance with our policy of protecting the privacy interests of victims of sexual assault or risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued December 1, 2010—officially released April 19, 2011

*James B. Streeto,* assistant public defender, for the appellant (defendant).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *Scott J. Murphy,* state's attorney, and *Christian Watson,* assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. The defendant, Mark R., appeals[1] from the judgment of the trial court, rendered after a jury trial, convicting him of one count of risk of injury to a child in violation of General Statutes (Rev. to 2005) § 53-21 (a) (2), and one count of sexual assault in the fourth degree in violation of General Statutes (Rev. to 2005) § 53a-73a (a) (1). On appeal, the defendant claims that the trial court improperly: (1) admitted the testimony of his pastor, which the defendant claims was protected by the clergy-penitent privilege; (2) permitted the state to obtain his counseling records and to elicit related testimony, which he claims were protected by the professional counselor-patient privilege; (3) limited the scope of cross-examination of the victim, in violation of his confrontation rights; (4) failed to disclose the victim's educational and counseling records following an in camera review; and (5) instructed the jury as to what constitutes a reasonable doubt. We affirm the judgment of the trial court.

The record reveals the following relevant facts, which the jury reasonably could have found, and procedural

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

history. At the time of the events in question, the victim, a fourteen year old girl, resided in Plainville with her mother, S, her stepfather, the defendant, and her two sisters, H and M, whom her parents had recently adopted from Ethiopia. In the early morning of October 25, 2006, S drove the defendant to the emergency room, where he was treated for welder's flash, a painful eye injury. Later that day, while S napped in her bedroom, the defendant and the children watched a movie together. The defendant and the victim sat together on a couch, while H and M sat in a chair situated between the sofa and the television. The victim dozed off during the movie and awoke during the final credits. Around that time, H left the room, but M remained in her chair watching the television.

As the movie ended the defendant began to touch and speak to the victim in a variety of inappropriate ways. He first began rubbing her bare stomach, an act which he had performed in the past and which the victim initially did not find troubling. He proceeded, however, to place his hand under her shirt and began rubbing her right breast over her bra. When the victim, who felt confused and frightened, did not react externally, the defendant lifted her bra and started rubbing her nipple. He continued touching her bare breast for several minutes, during which he told her that she had "nice breasts."

The defendant next undid the button and zipper of the victim's skirt and placed his hand underneath. He began rubbing her bare thighs, and then her vaginal area over the crotch of her panties. During the course of a few minutes of such touching, the defendant moaned and commented on the victim's pubic hair. The victim remained frozen with fear.

The defendant subsequently replaced the victim's skirt, moved his hand back to her breast, and asked if

he could touch her. At that point, the victim curled into a fetal position, with her knees protecting her chest, and pulled her hand away when the defendant tried to hold it. The defendant responded that he would "just stick to rubbing [the victim's] feet," and moved to the other side of the sofa. Roughly ten minutes later, the victim got up, went to her room and cried.

When S awoke, the family discussed who would take H and M to church, which the family regularly attended on Wednesday evenings. The victim ultimately announced that she did not feel well, so that she would be able to remain at home with S while the defendant took H and M to church. The victim subsequently went to S's bedroom, curled up on the floor and began crying. After several inquiries from S, the victim told her what the defendant had done.

S immediately called the church. When Associate Pastor Helmut Getto returned her call, she repeated the victim's allegations to him and they agreed that S and the victim would come to the church, where Getto would help them to confront the defendant. Getto testified that during that confrontation, the defendant, after initially denying that he had touched the victim inappropriately and asserting that he and the victim were "just fooling around," admitted " 'Yes, I did.' " The following day, the victim's allegations were reported to the department of children and families (department) and to the police.

Following a trial, the jury returned a verdict of guilty on both counts. The trial court rendered judgment in accordance with the verdict and imposed a total effective sentence of twenty years incarceration, execution suspended after seven years, followed by fifteen years probation.[2] Additional facts and procedural history will be set forth as necessary.

---

[2] Although the judgment file mistakenly indicates that the defendant was sentenced to five years of probation, there is no dispute that the trial court

## I

We first address the defendant's claim that the trial court improperly denied his motion in limine to preclude Getto's testimony. The defendant contends that any statements he made in Getto's presence were protected by the clergy-penitent privilege, codified at General Statutes § 52-146b,[3] and therefore were not subject to disclosure at trial without his consent. The trial court, however, found that inculpatory statements the defendant made in Getto's presence were not privileged because they were neither confidential nor made in the context of seeking religious or spiritual guidance or comfort from the pastor. We affirm the judgment of the trial court.

The following additional facts that the trial court reasonably could have found are relevant to the resolution of this claim. After the victim confided her allegations to S, S immediately telephoned Getto to enlist his assistance in confronting the defendant, who was attending church services at the time. The victim and S walked to the church where, pursuant to S's request, Getto escorted them to his office in a church owned building located next door to the main church. Getto then retrieved the defendant from church services and asked to speak with him. The defendant accompanied Getto to the pastor's office, where he found S and the victim waiting to confront him.

ordered fifteen years of probation with respect to the count of risk of injury to a child and imposed a total effective sentence of twenty years imprisonment, execution suspended after seven years, with fifteen years of probation.

[3] General Statutes § 52-146b provides: "A clergyman, priest, minister, rabbi or practitioner of any religious denomination accredited by the religious body to which he belongs who is settled in the work of the ministry shall not disclose confidential communications made to him in his professional capacity in any civil or criminal case or proceedings preliminary thereto . . . unless the person making the confidential communication waives such privilege herein provided."

At the time of the meeting, Getto believed that he, the defendant, the victim and S were alone in the building. Other people did routinely use the building, however, and it is impossible to know whether anyone else was nearby during the meeting. Although Getto left the door to his office open, he testified that, had he believed the building to be otherwise occupied, he probably would have closed the door.

Unlike in the family counseling sessions that Getto occasionally runs in his pastoral capacity, Getto did not begin this meeting by identifying the meeting as a family counseling session or explaining that statements made during the meeting would remain confidential. Rather, the meeting began when the defendant asked " 'What's going on?' " and S responded by asking whether he had touched the victim inappropriately. The meeting proceeded with S repeatedly asking the defendant whether he had touched the victim in certain ways. The defendant initially denied S's accusations, but eventually admitted " 'Yes, I did.' " At that point, Getto asked the defendant whether he had anything to say to the victim; the defendant offered a curt apology, bringing the meeting to a close.

Getto testified that he purposely did not offer any other advice or suggestions during the meeting. Rather, pursuant to S's request, Getto saw his role in the meeting as being limited to offering S his support and just "sit[ting] there to listen to what the two of them had to say, basically." Getto did agree with S's suggestion that the defendant not return to the family home that evening. After the meeting, Getto offered to drive the defendant home to pick up a few belongings, and invited the defendant to call him if the defendant wished to discuss the matter further. The following day, Getto informed S that either she or he would need to report the victim's allegations to law enforcement or the

department within twenty-four hours, because, as a pastor, he was a mandated child abuse reporter.

At trial, the defendant filed a motion in limine, seeking to exclude Getto's testimony as privileged. The state made an offer of proof and the court, after conducting an in camera hearing, denied the defendant's motion. The defendant challenges that ruling.

As a preliminary matter, we address the proper standard of review. The scope of an evidentiary privilege is a question of law, which we review de novo. *Hutchinson* v. *Farm Family Casualty Ins. Co.*, 273 Conn. 33, 38, 867 A.2d 1 (2005). The application of the privilege presents a mixed question of law and fact. *State* v. *Ross*, 269 Conn. 213, 291, 849 A.2d 648 (2004). " '[T]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record.' " *State* v. *Christian*, 267 Conn. 710, 732–33, 841 A.2d 1158 (2004).

The clergy-penitent privilege did not exist at common law, and is a creature of statute. *Cox* v. *Miller*, 296 F.3d 89, 102 (2d Cir. 2002). In Connecticut, the privilege is codified at § 52-146b. In *State* v. *Rizzo*, 266 Conn. 171, 283, 833 A.2d 363 (2003), we explained that in order to establish a privilege claim under § 52-146b, a defendant must demonstrate that: (1) there was a communication; (2) the communication was confidential; (3) it was made to a member of the clergy within the meaning of the statute; (4) the communication was made to the clergy member in his or her professional capacity; (5)

the disclosure was sought as part of a criminal or civil case; and (6) the defendant did not waive the privilege.

In the present case, the trial court found that the privilege did not attach because the defendant's statements were not confidential.[4] We agree, although our analysis diverges somewhat from that of the trial court. See *Webster Bank* v. *Oakley*, 265 Conn. 539, 554 n.14, 830 A.2d 139 (2003) ("It is well established that '[w]here the trial court reaches a correct decision but on [alternate] grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it. . . . [W]e . . . may affirm the court's judgment on a dispositive alternate ground for which there is support in the trial court record.' "), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004).

We note at the outset that, because testimonial privileges prevent full disclosure of the truth, they are to be strictly construed. See *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 330, 838 A.2d 135 (2004). Moreover, the party asserting the privilege has the burden of establishing its factual foundation. See *State* v. *Rizzo*, supra, 266 Conn. 283; *State* v. *Hanna*, 150 Conn. 457, 466, 191 A.2d 124 (1963).

The presence of third parties generally destroys the confidentiality of a communication, precluding a claim of privilege. *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 157, 757 A.2d 14 (2000). This rule does not apply, however, when the presence of the third parties is required to achieve the purpose of the communication. Id. Accordingly, the trial court's hear-

---

[4] The state also argues that: (1) the clergy-penitent privilege did not attach because the defendant did not approach Getto in the pastor's professional capacity; and (2) even if the privilege did attach, the defendant waived it by testifying at trial as to the content of the disputed communications. Because we agree with the trial court that the statements were not confidential, we need not address these arguments. The parties agree that the other elements of the privilege were satisfied.

ing focused on the question of whether the presence of the victim and S destroyed the confidentiality of the defendant's communications with Getto and therefore barred the defendant from claiming the clergy-penitent privilege. The defendant argued that his statements remained confidential because they were made in the context of a family counseling session, where the presence of all family members was instrumental to the intended outcome. The court found, however, that the mere presence of the victim and S precluded a finding of confidentiality, without addressing whether the meeting constituted a family counseling session and, if so, whether the presence of the victim and S was required to achieve the purpose of the communication.

Even assuming, arguendo, that the defendant is correct that the privilege created by § 52-146b extends to situations in which a clergy member provides marital or family counseling in his or her professional capacity, in order to claim the privilege the defendant must first establish that the meeting was in fact a confidential family counseling session. In evaluating claims of privilege, we assess the confidentiality of a communication according to a standard of objective reasonableness. *State* v. *Christian*, supra, 267 Conn. 738. Under this standard, "a communication is confidential if, at the time of the communication, the communicator could have had a reasonable expectation of confidentiality." Id. For the following reasons, we conclude that the defendant could not reasonably have expected that his statements during the meeting would remain confidential.

First, it is undisputed that the meeting lacked many of the indicia of confidentiality that characterize traditional individual and family counseling sessions. Getto never stated that the meeting was confidential. After he and the defendant arrived, Getto allowed his office door to remain open throughout the meeting. Although

he conceded on cross-examination that he "[p]robably" would have closed it had he become aware of other people entering the building, leaving the door ajar nevertheless created the possibility that the meeting would be overheard by unanticipated passersby. Additionally, under the circumstances, the defendant could not reasonably have believed that S and the victim would keep his admissions in confidence because S interrogated the defendant in order to obtain an admission from him, rather than engaging in any sort of private reconciliation process typical of family counseling.

Second, the record does not support the defendant's assertion that the meeting was the sort of family counseling session that might implicate the clergy-penitent privilege. Aside from agreeing to host the meeting in his office and bringing the defendant there, there is no indication in the record that Getto assumed a leadership role. Getto did not schedule the meeting to begin or end at a set time, establish any ground rules, open the conversation or draw it to a close; indeed, the defendant did not even know the reason he had been called to Getto's office. In short, Getto did not imbue the meeting with any of the trappings of a family therapy arrangement. Rather, it is undisputed that S requested the meeting, selected the location, initiated the confrontation, and ultimately succeeded in persuading the defendant to admit to his inappropriate conduct. Furthermore, there is no indication in the record that the defendant ever spoke directly to Getto about his conduct toward the victim, or that Getto spoke to him about his behavior. At most, Getto simply tried to help S remain calm. Accordingly, Getto served more as a neutral bystander to an ad hoc confrontation than as an active facilitator of a family therapy session, and there is no reason why his mere presence should transform the defendant's admissions into privileged communications.

We therefore conclude that the trial court properly determined that, because the defendant lacked a reasonable expectation that his inculpatory statements would be held in confidence, he failed to establish that the clergy-penitent privilege protected those statements from disclosure. Accordingly, we conclude that Getto's testimony was properly admitted.

II

We next address the defendant's claim that the trial court improperly admitted the testimony of professional counselor Alma Pollock. The defendant contends that his private communications with Pollock were protected by the professional counselor privilege, codified at General Statutes § 52-146s.[5] The trial court ruled, however, that, because Pollock, a mandatory reporter of child abuse allegations, had previously disclosed the defendant's counseling records to the department, the privilege no longer attached. We affirm the trial court.

The record reveals the following additional facts and procedural history relevant to the resolution of this claim. On November 9, 2006, the defendant visited the Wheeler Clinic (clinic) in Plainville to obtain counseling for personal problems he was experiencing in the wake of the victim's accusations and his wife's subsequent divorce filing. In the course of a two hour intake, he revealed to Pollock, a clinic employee, that he had placed his hand on his stepdaughter's breast. The following day, Pollock reported the defendant's disclosure

[5] General Statutes § 52-146s provides in relevant part: "(b) Except as provided in subsection (c) of this section, a professional counselor shall not disclose any [oral and written communications and records thereof relating to diagnosis and treatment] unless the person or the authorized representative of such person consents to waive the privilege and allow such disclosure. . . .

"(c) Consent of the person shall not be required for the disclosure of such person's communications . . .

"(6) If child abuse . . . is known or in good faith suspected . . . ."

to the department (report) as a suspected case of child abuse.

Prior to trial, the state subpoenaed the defendant's clinic records (records). In response, the defendant filed a motion in limine seeking to preclude the state's use of, reference to or disclosure of the records. The defendant argued that the records were privileged, confidential medical records protected under § 52-146s.[6] Following an in camera review of the records, the court granted the state full access to the records pursuant to § 52-146s (c) (6), concluding that a client of a professional counselor need not consent to disclosure of his records in a prosecution for child abuse.

At trial, the state indicated that it did not intend to enter the report or the records into evidence, but rather planned to question Pollock about the defendant's allegedly incriminating statements referenced therein. Prior to the state's direct examination of Pollock, defense counsel renewed the objection to the state's use of the records and the information contained in the report.[7]

___

[6] The defendant also argued at trial that disclosure of the records without his consent was barred by provisions of the Health Insurance Portability and Accountability Act of 1996, codified at 42 U.S.C. § 201 et seq. (2006). The trial court rejected that argument as well, pointing to title 42 of the Code of Federal Regulations, § 2.63 (a) (2), which contains an exception for child abuse. The defendant does not press the federal claim on appeal.

[7] The state contends that the defendant did not properly preserve his claim because at trial he objected only to the admission of the records, not to Pollock's testimony as to their content. We disagree. Although the defendant's objections were not a model of clarity, his February 15, 2008 motion in limine sought broadly "to preclude mention, disclosure or sharing of [the] defendant's confidential medical records . . . ." The motion specifically asked the trial court "to order the prosecution *and any of its witnesses* who may have knowledge to avoid any reference, direct or indirect, in the presence of the jury, to [the] defendant's *confidential medical information* contained in records obtained from [the] [c]linic . . . ." (Emphasis added.) It is clear that the defendant sought from the outset to block not only the release of his records to the state, but also any reference by prosecution witnesses to the information contained in those records.

The court permitted the state to examine Pollock, limited to the information contained in the report.

The defendant's claim raises a question of first impression: whether a professional counselor's report of suspected child abuse to the department, as required by General Statutes § 17a-101 et seq. and contemplated by § 52-146s (c) (6), abrogates the testimonial privilege as to a subsequent criminal prosecution. This presents a question of statutory interpretation, which we review de novo. *State* v. *Orr*, 291 Conn. 642, 650, 969 A.2d 750 (2009).

On its face, § 52-146s appears to carve out a broad general exception to the professional counselor privilege when a client indicates that he may have abused a child. Section 52-146s (c) (6) provides in relevant part that consent of the client "shall not be required for the disclosure of such person's communications . . . [i]f child abuse . . . is known or in good faith suspected . . . ." Once a client makes such an admission to a counselor, there is no indication, in either the text of the statute or its legislative history, that the counselor must obtain his consent for *any* subsequent disclosures. Nevertheless, the defendant posits that this exception should be construed narrowly to apply only to the initial reporting of suspected abuse to the department. He contends that once a counselor has filed the mandatory report with the department, the rationale for abrogating the privilege—protecting the child in question from further abuse—has been accomplished, and the privilege should attach in any subsequent legal proceedings.

In support of his interpretation of the statute, the defendant directs our attention to *State* v. *Orr*, supra, 291 Conn. 642. The defendant in *Orr* was charged with making harassing telephone calls to a police officer. The trial court admitted, over the defendant's objection, the testimony of his social worker as a witness for

the prosecution. Id., 649. The trial court found that, although communications made in the context of receiving evaluation or treatment by a social worker are confidential under General Statutes § 52-146q, the exception provided in subsection (c) (2) of that statute, which permits disclosure "when a social worker determines that there is a substantial risk of imminent physical injury by the person to himself or others," meant that the defendant could not bar the social worker from testifying against him at trial. *State* v. *Orr*, supra, 648. On appeal, this court disagreed, holding that while the imminent physical injury exception permits disclosure of confidential client communications to the extent necessary to avert such injury, it does not permit the social worker to testify at a subsequent criminal proceeding. Id., 655–56.

The defendant in the present case contends that *Orr* controls the result here. He argues that, as with the social worker statute, the professional counselor statute only contemplates an initial disclosure of a client's admissions of child abuse, and only to the extent required by law and necessary to secure the safety of the child, and therefore the statute does not permit a counselor subsequently to testify against her client at trial. We disagree.

Several relevant features distinguish the professional counselor statute from the social worker statute we interpreted in *Orr*. First, in carving out the imminent risk and other exceptions to the social worker privilege in § 52-146q (c), the legislature emphasized that "[c]onsent of the person shall not be required for the disclosure or transmission of such person's communications and records in the following situations *as specifically limited* . . . ." (Emphasis added.) In *Orr*, we relied heavily on the phrase " 'as specifically limited' " in concluding that the legislature intended that any exceptions to the privilege be narrowly construed. *State* v. *Orr*,

supra, 291 Conn. 656–57. The suspected child abuse exception to the professional counselor privilege set forth in § 52-146s, by contrast, contains no such limiting language. Because the professional counselor statute was enacted eight years after the social worker statute, and contains much of the same language, it is reasonable to conclude from the omission of the phrase "as specifically limited" that the legislature did not intend that exceptions to the professional counselor privilege be construed more narrowly than their plain meaning would otherwise indicate.

Second, as the state notes, *Orr* dealt with an imminent risk exception to a privilege statute, whereas the present case concerns a child abuse exception. We agree with the state that this distinction is significant. If a professional is permitted to breach a client's confidentiality only to avert imminent risk to a third party, then, once that risk has passed, the obligations of privacy and loyalty inherent in a professional helping relationship weigh against permitting the professional to testify against the client at trial. Child abuse is different, the state suggests, because the purpose of disclosure is not only to protect but also to prosecute. Permitting a counselor to testify against a client is therefore not inconsistent with the rationale underlying the exception.

A review of the child abuse reporting statutes makes clear that the legislature imposed a reporting requirement on counselors and other mental health professionals to facilitate the prosecution of past abuses as well as to prevent ongoing and future abuses. See General Statutes § 1-2z (plain meaning of statute is to be determined in light of its relationship to other statutes). Section 17a-101 (b) includes licensed professional counselors among those individuals required to report suspected child abuse. General Statutes § 17a-101b (a) permits mandatory reports of abuse to be made either

to the commissioner of children and families (commissioner) or to "a law enforcement agency." In the event that the counselor opts to notify the commissioner, § 17a-101b (c) requires that the commissioner in turn notify the appropriate law enforcement agency, within twelve hours, of any allegations of past acts of sexual or serious physical abuse. General Statutes § 17a-101e (b) further provides that any person who, in good faith, makes a mandatory report of child abuse "shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed *and shall have the same immunity with respect to any judicial proceeding which results from such report* . . . ." (Emphasis added.) General Statutes § 17a-101f also specifies that if a physician examines a child suspected of having been abused, and obtains photographic documentation of the child's injuries, that documentation shall be sent to the local police department as well as to the department. Finally, General Statutes § 17a-28 (i) provides that, notwithstanding other provisions of the law providing that the name of a person reporting suspected child abuse shall be presumptively confidential, the commissioner may, without consent, disclose the mandated reporter's name to, inter alia, a law enforcement officer, a state's attorney, "a judge of the Superior Court and all necessary parties in . . . a criminal prosecution involving child abuse or neglect . . . ."

Taken together, these provisions demonstrate a clear legislative intent that any mandatory report of child sexual abuse be channeled simultaneously into: (1) a child protection investigation, spearheaded by the department, to prevent future abuse; *and* (2) a criminal investigation, spearheaded by local law enforcement, to address past abuse. Unlike the imminent risk exception in § 52-146q (c) (2), the child abuse exception contained in § 52-146s (c) (6) is in part remedial. Accordingly, we discern no basis for reading into § 52-

146s an implied distinction between disclosure of confidential communications for purposes of child protection and criminal prosecution.

We also are not persuaded by the defendant's argument that permitting a mandated reporter to testify in a criminal prosecution will chill far more client communications than does the reporting requirement itself. As we have discussed, any report to the department of sexual or serious physical abuse of a child necessarily results in a criminal investigation. If the prospect of a criminal investigation does not deter a client from revealing to his counselor that he has abused a child, we doubt very much that he will be silenced by the possibility that his counselor may ultimately share his admission with a jury as well as with the department.

### III

We next address the defendant's claim that the trial court improperly curtailed his cross-examination of the victim, in violation of his constitutional rights to confrontation and to present a defense.[8] Specifically, the defendant contends that the trial court should have allowed him a fuller opportunity to impeach the victim's credibility by exploring what he alleges were possible rationales for her to fabricate the allegation of abuse. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this claim. At trial, defense counsel attempted to undermine the credibility of the victim and S by suggesting to the jury that the victim had fabricated the allegations either: (1) on her own accord, because she felt jealous that S had become

---

[8] Although the defendant makes this claim pursuant to the federal and state constitutions, he fails to provide an independent analysis under the state constitution. Thus, we confine our analysis to a discussion of the defendant's rights under the federal constitution.

preoccupied with adopting and caring for H and M; or (2) at the prompting of S, who, defense counsel contended, resented that the defendant did not earn enough money and thus sought to extricate herself from their marriage and obtain sole possession of the family assets. In an offer of proof during cross-examination of the victim, defense counsel argued that "this is going to the behavioral issues that developed as a result of the adoption process and the resulting adoption of the two children and it goes to whether [the victim] did have a basis for making these false allegations." Although the trial court did permit some cross-examination of the victim and S aimed at developing these theories, it also upheld a number of the state's objections as to their relevance. The defendant challenges those rulings. Additional facts will be set forth as necessary.

The legal standards governing the review of alleged violations of a criminal defendant's sixth amendment[9] right to cross-examine witnesses are well established. "The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . ." (Internal quotation marks omitted.) *State* v. *Erickson*, 297 Conn. 164, 188, 997 A.2d 480 (2010). "Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. . . . The defendant's right to cross-examine a witness, however, is not absolute." (Internal quotation marks omitted.) Id., 189. "[T]he [c]onfrontation [c]lause guarantees only an opportunity for effec-

___

[9] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . and to have the assistance of counsel for his defense."

tive cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination." (Internal quotation marks omitted.) Id., 188.

"Only relevant evidence may be elicited through cross-examination." (Internal quotation marks omitted.) Id. As a general matter, inquiry into prototypical forms of bias is by its very nature relevant to a witness' testimony. *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679–80, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); see also *Davis* v. *Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) ("[t]he partiality of a witness . . . is 'always relevant as discrediting the witness and affecting the weight of his testimony' "); *Redmond* v. *Kingston*, 240 F.3d 590, 592 (7th Cir. 2001) (cross-examination to show complaining witness had motive to lodge false accusation against defendant deemed "highly probative"). Constitutional concerns are at their apex when the trial court restricts a defendant's ability to cross-examine a key government witness. See *State* v. *Colton*, 227 Conn. 231, 250, 630 A.2d 577 (1993); see also *State* v. *Corley*, 177 Conn. 243, 247, 413 A.2d 826 (1979) (cross-examination of state's " 'chief witness' " deemed crucial and therefore improperly curtailed).

Even when the proffered testimony is relevant, however, the confrontation clause is offended only when a trial court precludes defense counsel from exposing to the jury "facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska*, supra, 415 U.S. 318. In such cases, constitutional prejudice is established where a "reasonable jury might have received a significantly different impression of [a witness'] credibility had [defense] counsel been permit-

ted to pursue his proposed line of cross-examination." *Delaware* v. *Van Arsdall*, supra, 475 U.S. 680; see, e.g., id., 679–80 (confrontation clause violation where trial court prohibited all inquiry into possibility that state's witness was biased as result of dismissal of pending charge); *Davis* v. *Alaska*, supra, 318 (confrontation clause violation where defense counsel was permitted to ask witness if he was biased, but not to elicit any facts supporting allegation of bias); *Olden* v. *Kentucky*, 488 U.S. 227, 232, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988) (confrontation clause violation where court refused to allow cross-examination as to accuser's relationship with another man when that relationship tended to show motive to testify falsely).

This analysis necessarily involves a " 'case-and-fact-specific balancing test,' " weighing the relevance of the proposed cross-examination to the defendant's case against the potential to cause unfair prejudice to the victim and the extent to which the inquiry would be repetitive or duplicative of other evidence. *Barresi* v. *Maloney*, 273 F. Sup. 2d 144, 152 (D. Mass. 2003). "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Provost*, 251 Conn. 252, 256–57, 741 A.2d 295 (1999), cert. denied, 531 U.S. 822, 121 S. Ct. 65, 148 L. Ed. 2d 30 (2000). Finally, "trial judges retain wide latitude insofar as the [c]onfrontation [c]lause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware* v. *Van Arsdall*, supra, 475 U.S.

679. For example, we have upheld restrictions on the scope of cross-examination where the defendant's allegations of witness bias lack any apparent factual foundation and thus appear to be mere fishing expeditions. See, e.g., *State* v. *Barnes*, 232 Conn. 740, 749–50, 657 A.2d 611 (1995).

Consistent with these principles, we have rejected confrontation challenges in child abuse cases where the trial court permitted at least some inquiry into the witness' possible motives for untruthfulness.[10] See, e.g., *State* v. *Bova*, 240 Conn. 210, 226, 690 A.2d 1370 (1997) (no confrontation violation where defendant was precluded from inquiring into witness' alleged stalking but had established witness' intense and abiding hostility toward him); *State* v. *Williams*, 81 Conn. App. 1, 22–25, 838 A.2d 214 (2004) (no violation where defendant was permitted to cross-examine victim's mother about victim's need for counseling and difficulty concentrating following parents' divorce, but barred from inquiring further as to behavioral and personality changes arising therefrom), cert. denied, 268 Conn. 904, 845 A.2d 409 (2004).

In the present case, the trial court ruled irrelevant and barred defense counsel from cross-examining the victim as to her relationship with a Russian girl who had joined the family for three weeks before her adoption fell through, how much time S spent on the computer researching the adoption of H and M prior to their arrival, whether the victim's viewing of the "Law and Order" television show included the "Special Victim's Unit" edition, whether the victim had behavioral problems at school before S began homeschooling her, and

---

[10] Also consistent with these principles, in cases in which sexual abuse of a child is alleged, courts have found confrontation clause violations where the defendant was barred completely from pursuing a theory that the complainant had a motive to fabricate the allegations. See, e.g., *United States* v. *Moss*, 63 M.J. 233, 237 (C.A.A.F. 2006).

whether, in the victim's view, S thought the defendant did not make enough money. Nevertheless, over the course of a cross-examination of the victim that filled more than thirty transcript pages, the trial court did permit defense counsel to inquire into numerous elements of the defendant's fabrication theory. Defense counsel questioned the victim generally about the adoption of H and M, the length of time S spent traveling to bring H and M to the United States, the activities the victim and the defendant engaged in prior to the adoption and whether she joined fully in his play with H and M after their arrival, whether S was less available to the victim after the adoption, whether the victim watched the "Law and Order" television show, and whether the victim felt jealous of and was unkind to H and M. Moreover, the prosecutor twice asked the victim, directly, whether she had fabricated the allegations because she was jealous of her new sisters.[11]

_____

[11] The defendant nevertheless contends that "an entire area of cross-examination of the state's most crucial witness was barred." He appears to base this claim on the assertion that, although the trial court permitted inquiry into the victim's alleged *feelings* of jealousy, the court precluded any inquiry into behavioral *manifestations* of those feelings that, according to the defendant, the jury could have found more persuasive. Even if we were to agree that this distinction is meaningful for sixth amendment purposes, we disagree that the defendant was barred entirely from questioning the victim as to the alleged manifestations of her jealousy. For example, defense counsel was permitted to inquire, over the state's objection: "You weren't always nice to [M and H] were you? . . . So if they sat down at a table—at the table, you would get up? . . . But you do say you would fight with them?" At that point, defense counsel chose to move on to another line of questioning.

We also are not persuaded that the defendant's right to confrontation was violated by his inability to question the victim about alleged behavioral problems that led to her being homeschooled. The defendant testified that the victim stopped attending school, and began homeschooling, three years before her parents adopted H and M. It is thus impossible that any difficulties she had at school were provoked by her feelings about the adoption. Accord *State* v. *Baker*, 390 S.C. 56, 65–66, 700 S.E.2d 440 (App. 2010) (where defendant theorized that complainant fabricated allegations of sexual abuse to distract attention from her recent school disciplinary infractions, affirming trial court restrictions on cross-examination because one incident was too minor to warrant inventing such allegations and another took place after

We agree with the state that, even if the excluded lines of questioning were generally relevant to the defendant's theory of the case, the scope of cross-examination permitted by the trial court afforded the defendant adequate opportunity to put before the jury his theory that the victim had fabricated the allegations. Any additional cross-examination sought by the defendant was too remotely related to the victim's credibility to be required by the sixth amendment.

Likewise, in the course of a lengthy cross-examination of S, the trial court sustained only three objections to the defendant's proposed line of questioning. The defendant was barred from inquiring as to S's recent health status, as to an arrest for larceny that had occurred more than thirty years before, and as to whether a department employee had indicated to S that it was improper for the victim to babysit for H and M. Defense counsel did cross-examine S regarding several key elements of the defense theory, including her efforts to obtain exclusive possession of the family home and car during her divorce from the defendant, her alleged arguments with the defendant about his income and her alleged reluctance to obtain abuse counseling for the victim. Once again, we conclude that the jury had an adequate opportunity to judge the motive and credibility of the state's key witnesses.

Lastly, we note that a number of courts, in considering confrontation clause challenges where a defendant has been permitted to cross-examine a state's witness but has been barred from pursuing particular lines of inquiry, look not only to the scope of cross-examination permitted but also to the overall case presented by the defense to assess whether the jury had an adequate opportunity to evaluate the witnesses' credibility and

allegations had been made), rehearing denied, 2010 S.C. App. LEXIS 193 (August 27, 2010).

potential bias. In *Barresi* v. *Maloney*, supra, 273 F. Sup. 2d 154, for example, the court noted that " '[w]hen a witness's credibility is at issue, the trial court may impose limits on cross examination without violating a defendant's confrontation right so long as the court grants the defendant sufficient leeway to establish a reasonably complete picture of the witness's bias and motivation to fabricate.' " In that case, the court weighed not only the cross-examination of the complaining witness permitted by the court, but also the defense's cross-examination of her mother, direct examination of the defendant, and closing statements, in concluding that the defendant's confrontation rights were not violated. Id., 153–54; see also *United States* v. *Derr*, 990 F.2d 1330, 1334 (D.C. Cir. 1993) (defense could point jury to physical evidence to supplement restricted cross-examination of witness), overruled in part on other grounds by *United States* v. *Bailey*, 36 F.3d 106, 118 (D.C. Cir. 1994).

In the present case, on direct examination defense counsel was able to question the defendant at some length about the victim's and S's alleged motives to fabricate. The defendant testified about S's "obsession" with the adoption process, changes in the victim's relationship with her parents after the adoptions, tensions between the victim and her new sisters, the victim's feelings of jealousy toward her new sisters, whether S encouraged the victim to misrepresent herself, and marital problems between the defendant and S that, according to defense counsel, evinced S's motive to falsely incriminate him. The trial court overruled numerous objections as to the relevance of those inquiries, sustaining objections only as to: (1) the defendant and S's prior, failed adoption of a special-needs child from Russia; (2) whether the victim had ever been mean to other children prior to the arrival of H and M; and (3) whether S had the ability to "manipulat[e]" the victim.

Finally, in closing arguments, defense counsel argued at length that S had manipulated the victim into fabricating the allegations.

Viewing the trial in its totality, it is apparent that the jury had a fair opportunity to consider facts tending to support the defendant's theory of the case, and to assess the credibility of both the victim and the defendant in this regard. Under the circumstances, we cannot conclude that additional inquiries would have fundamentally altered the jury's perspective. Accordingly, we find no violation of the defendant's sixth amendment rights to confront his accusers and to present a defense.

IV

We next address the defendant's claim that the trial court improperly denied him access to certain of the victim's private records in violation of the defendant's right to confrontation. The defendant subpoenaed and sought direct access to two sets of records for impeachment purposes. The first are records of the victim's counseling sessions on five occasions in 2007. The second are academic records from the school that the victim attended in 2001 and 2002.[12]

Following an in camera review of the records, the trial court denied the defendant's request, finding that the records did not contain exculpatory or impeachment evidence, or other evidence relating to the victim's ability to comprehend, know and correctly relate the

[12] Defense counsel suggested at trial that the information contained in the records would shed light on the veracity of both the victim and S. It is not entirely clear from the record whether the defendant's claim was that: (1) the records would reveal evidence of other, independent incidents of dishonesty; or (2) that the records would merely reinforce the defendant's argument that the victim and S had fabricated the charges against the defendant, for example by supporting the defendant's claims that the victim was a "troubled" teenager and that S was reluctant to allow her to speak with professional counselors. The records contain no evidence to support either claim.

truth. The defendant has requested that we conduct an independent appellate review of the documents to determine whether the trial court abused its discretion. See *State* v. *Slimskey*, 257 Conn. 842, 845–46, 779 A.2d 723 (2001); *State* v. *King*, 216 Conn. 585, 599–600, 583 A.2d 896 (1990).

"A trial court is to inspect confidential . . . records to determine whether, within its discretion, the material contained therein is 'especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences.' " *State* v. *Pratt*, 235 Conn. 595, 608, 669 A.2d 562 (1995). Having carefully reviewed the records in light of this standard, we are not persuaded that the trial court abused its discretion by denying the defendant's request for access.

V

Lastly, we address the defendant's claim that the trial court improperly instructed the jury as to the state's burden of proof, in violation of his rights to due process and a fair trial under the federal constitution. Specifically, he contends that the court's jury instructions "diluted" the state's burden of having to prove guilt beyond a reasonable doubt. We disagree.

The following procedural history is relevant to our resolution of this claim. At the conclusion of trial, the trial court instructed the jury that "[t]he meaning of reasonable doubt can be arrived at by emphasizing the word reasonable. . . . It is such a doubt . . . as in the serious affairs that concern you, you would heed. That is such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. . . . It is, in other words, a real doubt, an honest doubt . . . ." The defendant objects to the court's use of these instructions in lieu of his proposed reasonable doubt instructions, and contends that, taken in tandem, these instructions rise to the level of reversible error.

The defendant concedes, however, that this court has rejected virtually identical claims on multiple occasions.[13] See, e.g., *State* v. *Bowman*, 289 Conn. 809, 811 n.2, 960 A.2d 1027 (2008). We conclude that the defendant has offered no compelling reason for us to reconsider these cases. Moreover, we see no reasonable possibility that the challenged language, when read in the context of the entire charge regarding reasonable doubt, misled the jury in its understanding of the state's burden of proving the defendant's guilt beyond a reasonable doubt. See id. Accordingly, we reject the defendant's claim of instructional impropriety and conclude that the trial court properly instructed the jury on reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[13] The defendant raises this issue in anticipation of a future federal habeas corpus claim.