STATE OF CONNECTICUT *v.* WILLIAM T. JONES
(AC 33044)

Alvord, Bear and Sheldon, Js.

Argued October 11, 2012—officially released January 29, 2013

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Mary Elizabeth Baran*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, William T. Jones, appeals from the judgment of conviction, rendered after a jury trial, of assault of a police officer in violation of General Statutes § 53a-167c and increasing the speed of a motor vehicle in an attempt to escape or elude a police officer in violation of General Statutes § 14-223 (b). On appeal, the defendant claims that the trial court (1) abused its discretion by not submitting an exhibit to the jury, (2) violated the defendant's confrontation clause rights by allowing a supervising physician, rather than the treating physician, to testify about the injury that resulted in the defendant's conviction, and (3) violated the defendant's confrontation clause rights by not reviewing a personnel file in camera and disclosing to the defendant any potentially exculpatory evidence found therein. We disagree with the defendant's claims and affirm the judgment of conviction.

The jury reasonably could have found the following facts in support of its verdict. On December 12, 2008, Detective Jose Rivera and Officer Christian Rodriguez of the Meriden police department observed the driver of a green Dodge Charger engage in what appeared to be a transaction involving narcotics. After the suspected narcotics transaction was completed, the driver of the Charger began to drive away, and Rivera and Rodriguez followed the Charger in their unmarked police vehicle. Rodriguez, through radio communication with the police dispatcher, learned that the Charger was a rented vehicle, and he requested that the dispatcher send a marked police cruiser to stop the Charger. Soon thereafter, Officer George Gonzalez, driving a marked police cruiser, activated the cruiser's emergency lights and stopped the Charger. Gonzalez parked the cruiser perpendicularly in front of the Charger, and Rodriguez parked the unmarked vehicle behind the Charger.

Rodriguez exited the unmarked vehicle and, as he was approaching the Charger, identified himself as a police officer and requested that the driver show him his hands. When the driver did not comply, Rodriguez drew his firearm and held it in a low, ready position while continuing to approach the Charger. Rodriguez arrived at the window on the driver's side of the Charger and again ordered the driver to show him his hands. The next series of events—in which the Charger backed up, accelerated forward and Rodriguez fired two gunshots from his firearm—occurred over the course of a couple of seconds. When the Charger backed up, the driver's side mirror, door area and quarter panel struck Rodriguez, and when it accelerated forward, one of the Charger's tires ran over Rodriguez' left foot. The two gunshots Rodriguez fired struck the side of the Charger, which sped away. Gonzalez pursued the Charger in the police cruiser, as did Rivera and Rodriguez in the unmarked vehicle, but their efforts were unsuccessful.

After disengaging from pursuit of the Charger, Rodriguez went to the Midstate Medical Center in Meriden (medical center), where he received treatment for his injured foot. The following day, he identified the defendant as the driver of the Charger from a photographic array. In the interim, the woman who had rented the Charger informed the police that she had rented the Charger at the request of the defendant. The defendant was arrested on January 12, 2009, in Rochester, New York, pursuant to a fugitive warrant. Additional facts will be set forth as necessary.

I

The defendant first claims that the court erroneously instructed the jury that, during deliberations, it could view a dashboard camera video recording, which had been introduced as a full exhibit, in the courtroom rather than in the jury deliberation room. He argues that the judgment should be reversed and the case remanded for a new trial because the court's ruling concerning the viewing of the video by the jury violated Practice Book § 42-23 (a) (2).[1] We disagree and conclude that the court did not abuse its discretion in

[1] The defendant contends that allowing only for the replaying of the video in the courtroom in front of the court, both attorneys and the defendant constituted structural error. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Internal quotation marks omitted.) State v. Dalton, 100 Conn. App. 227, 230 n.3, 917 A.2d 613, cert. denied, 282 Conn. 913, 924 A.2d 139 (2007). Because we hold that the court did not commit any error, let alone that the entire trial process was defective, we summarily conclude that the replaying of the video in the courtroom during jury deliberations did not constitute structural error.

In the alternative, the defendant contends that the court's handling of the video should be analyzed under a harmless error analysis. Because we

permitting the jury to view the video only in the court-
room during jury deliberations.

The record reflects the following procedural history
and additional facts, which are relevant to this claim.
On December 12, 2008, the marked police cruiser driven
by Gonzalez activated its emergency lights to indicate
to the driver of the Charger that he should stop the car.
When the emergency lights in Gonzalez' cruiser were
activated, a dashboard camera automatically turned on.
The video recording from this camera revealed the
Charger slowing and then stopping on a street that
intersected with the street on which Gonzalez was driv-
ing, Gonzalez' cruiser stopping perpendicularly in front
of the Charger, the sound of muffled voices and two
gunshots, the Charger driving off rapidly and the ensu-
ing unsuccessful car chase.

At trial, the state submitted, as a full exhibit and
without objection, a digital versatile disc (DVD)

---

determine that the court did not abuse its discretion, we need not address
whether the error was harmless. "When reviewing claims of error, we exam-
ine first whether the trial court abused its discretion, and, if so, we next
inquire whether the error was harmless." *State* v. *Payne*, 303 Conn. 538,
552–53, 34 A.3d 370 (2012).

The defendant also argues that withholding recorded evidence from the
jury deliberation room violated his constitutional rights to a fair trial and
due process. These claims were not preserved at trial, so he seeks review
under the familiar four prongs of *State* v. *Golding*, 213 Conn. 233, 239–40,
567 A.2d 823 (1989), or alternatively, under the plain error doctrine pursuant
to Practice Book § 60-5. We recently addressed the issue of whether
restricting a jury's viewing of a video exhibit to the courtroom during deliber-
ations violated the defendant's constitutional rights or constituted plain
error. See *State* v. *Osbourne*, 138 Conn. App. 518, 535–40, 53 A.3d 284, cert.
denied, 307 Conn. 937, 56 A.3d 716 (2012). In *Osbourne*, we held that the
defendant's claim failed to meet the second prong of *Golding*, i.e., a claim
of constitutional magnitude, and that the court's ruling concerning the video
was not a manifest injustice constituting plain error. Id., 539–40. Because
the facts surrounding the viewing of this video are substantially similar to
the facts surrounding the viewing of the video in *Osbourne*, we apply the
logic of *Osbourne* to this case, and dismiss the defendant's constitutional
and plain error arguments with regard to this issue.

recording of the video, which had been duplicated onto multiple DVDs. Both the state and the defendant utilized the video at various times throughout the trial by playing a DVD on the prosecutor's laptop computer, which projected the images so that the jury could view the video from the jury box. The record reveals that, during the trial, the jury viewed the entire video approximately eight times, and that the jury viewed selected portions of the video approximately eight additional times.

Both the state and the defendant showed the video during their closing arguments on April 12, 2010. After closing arguments, the court instructed the jury and adjourned court until the following day. On the morning of April 13, 2010, there was a chambers conference with the court, the prosecutor and defense counsel pertaining to a separate evidentiary matter. Once court was opened, defense counsel noted for the record that the conference had taken place. The court asked whether either party had anything to discuss before the jury was called, and both stated, through counsel, that they had nothing further. At that point, for the first time on the record, defense counsel asked whether the jurors would be able to view the video in the jury room.[2] The

[2] The following colloquy is the full extent of any discussion pertaining to the jury's access to the dashboard camera video prior to the entering of a verdict:

"[Defense Counsel]: Your Honor, just, if I may inquire? Is the—the video—this whole setup of the electronics going to be left in this courtroom or—or into the jury deliberation room?

"The Court: No, it's just going to be left here. My—my view is, I don't have anything to send into them for them to play the video. If they want to have the video replayed, they're going to have to request it and we'll play it in the courtroom. And, in fact, I can tell them that.

"[Defense Counsel]: Without us present?

"The Court: No, no. My view is, anything that's done in the courtroom, counsel and [the defendant] and I should be present. So, basically, it's just like a playback of testimony. If they want a replay of the video, I'll have them come out here and we'll replay the video.

"[Defense Counsel]: I—it seems to me, and I'm not trying to be difficult here, Your Honor, but for a free flow of—of conversation where they can stop and start and stop and start the video and actually deliberate about

court responded that it did not have equipment that could be sent into the jury room to play the video. The court offered that should the jury want the video replayed, it could be done in the courtroom, where counsel, the defendant and the court would be present. The court likened the procedure to the playback of testimony, in that the jury could submit a note to the court indicating its desire to replay the video, and all the aforementioned persons would congregate in the courtroom for the replaying. The jury was given this instruction, and after just less than one hour of deliberation, without asking to replay the video, the jury reached a verdict.

On June 25, 2010, at the defendant's sentencing hearing, defense counsel again voiced concern about the absence of the video from the jury deliberation room. The defendant moved for a judgment of acquittal and a new trial on the ground that requiring the jury to view the video in the courtroom "unfairly and unduly reduced [the jury's] ability to freely discuss the facts of the case . . . ." The court reiterated that there was no mechanism available at the time that would have allowed the jury to view the video in the jury deliberation room.

---

the video, shouldn't it—shouldn't they actually be alone when they're looking at this video?

"The Court: I don't think that's necessary. I don't have anything for them to play it on in the jury room. I don't have anything to send it in with, so they're just going to have to come out and ask for it.

"[Defense Counsel]: Couldn't all this equipment be sent in?

"The Court: Well, my con—they need—they need—would need the laptop to play the video, is—right? I assume that's right, correct?

"[The Prosecutor]: Uh, hum.

"The Court: Is—is the—and I—does the laptop have any—other stuff on it besides the video?

"[The Prosecutor]: Yes.

"The Court: Yes. That's the problem. I can't be sending anything into the jury room that has other documents or items on it that haven't been made full exhibits. I'll make it clear to them, if they want to re-see the video, then we can replay it—they can request it and we'll play it in the courtroom."

The court further stated that it was the court's belief that the access the jury had to the video—the same access juries are entitled to with regard to the playback of testimony—did not prejudice the defendant. The defendant's motion was denied, and he was sentenced to imprisonment of seventy-eight months for the assault on Rodriguez and one year for escaping from police pursuit, to be served concurrently with the sentence for the assault.

"[A]lthough the defendant's claim is not a classic evidentiary claim, in that it does not challenge the admission or exclusion of evidence or limitations upon the uses to which admitted evidence lawfully could be put, it concerns the process by which admitted evidence was made available to the jury for its review and consideration in the course of deliberations." *State* v. *Osbourne*, 138 Conn. App. 518, 538, 53 A.3d 284, cert. denied, 307 Conn. 937, 56 A.3d 716 (2012). "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Morquecho*, 138 Conn. App. 841, 847, 54 A.3d 609 (2012).

Practice Book § 42-23 (a) states in relevant part: "The judicial authority shall submit to the jury . . . [a]ll exhibits received in evidence." Such exhibits are distinguished from other items, listed in subsection (b), that "[t]he judicial authority may, in its discretion, submit to the jury . . . ." Practice Book § 42-23 (b). On appeal, the defendant argues that use of the word "shall" in

subsection (a), as opposed to the word "may" in subsection (b), creates a mandatory directive with regard to exhibits received in evidence. The defendant further argues that the procedure the court followed for the replaying of the video—the procedure for the replaying of testimony as set forth in Practice Book § 42-26—was improper because the rules of practice set different standards for testimonial and demonstrative evidence. We agree with the defendant that testimonial and demonstrative evidence are subject to the standards set forth in Practice Book §§ 42-26 and 42-23, respectively, and that Practice Book § 42-23 requires commanding the court to submit exhibits received in evidence to the jury. We disagree, however, with the defendant's contention that the video was not submitted to the jury.

"The rules of statutory construction apply with equal force to Practice Book rules." (Internal quotation marks omitted.) *Vargas* v. *Doe*, 96 Conn. App. 399, 412, 900 A.2d 525 (2006). "The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory. . . . If, however, the . . . provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory . . . . Definitive words, such as must or shall, ordinarily express legislative mandates of a nondirectory nature. . . . As we recently noted, the word shall creates a mandatory duty when it is juxtaposed with [a] substantive action verb." (Citations omitted; internal quotation marks omitted.) *Wiseman* v. *Armstrong*, 295 Conn. 94, 100–101, 989 A.2d 1027 (2010). As such, "Practice Book § [42-23] is not a discretionary rule." *State* v.

*Carmon,* 47 Conn. App. 813, 826, 709 A.2d 7, cert. denied, 244 Conn. 918, 714 A.2d 7 (1998).

"Words and phrases are to be given their ordinary meaning in construing statutes unless the text indicates otherwise." *State* v. *Cook,* 183 Conn. 520, 522, 441 A.2d 41 (1981), citing General Statutes § 1-1. Dictionary definitions of "submit" include in relevant part: "[t]o commit (something) to the consideration or judgment of another"; American Heritage Dictionary of the English Language (New College Ed. 1981); "to present for the approval, consideration, or decision of another or others"; Random House Webster's Unabridged Dictionary (2d Ed. 2001); "to send or commit for consideration, study, or decision . . . to present or make available for use or study"; Webster's Third New International Dictionary. A review of these definitions reveals the two crucial components of the ordinary meaning of "submit": the subject matter in question must be (1) committed, presented or sent to a person or persons (2) for consideration, study, decision or judgment.

More than one century ago, our Supreme Court stated that "every tribunal for the trial of civil or criminal causes should have open to it the best *legitimate* means of acquiring such knowledge of the law and facts as will enable it to decide the cases before it fairly and intelligently." (Emphasis added.) *State* v. *Rubaka,* 82 Conn. 59, 67, 72 A. 566 (1909). The trial court has "the authority to manage cases before it"; (internal quotation marks omitted) *State* v. *Colon,* 272 Conn. 106, 256, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); "and may, of course, take all steps reasonably necessary for the orderly progress of the trial." *State* v. *Woolcock,* 201 Conn. 605, 622, 518 A.2d 1377 (1986).

In this case, the court instructed the jury that it could view the video in the courtroom. This instruction provided a means of presenting the video to the jury for

its consideration, and, therefore, fell within the ordinary meaning of "submit." The court, using its inherent authority to manage the trial before it, offered the best legitimate means of presenting the exhibit to the jury in compliance with the mandatory directive of Practice Book § 42-23. The record reflects that defense counsel raised to the court his concern that the jury be able to view the video in the jury deliberation room only moments before the final jury instructions were given. Under such circumstances, and with no other viable option presented to it, the court took the reasonable and necessary action to ensure compliance with the rules of practice and the orderly progress of the trial. The court did not abuse its discretion in instructing the jury that it could view the dashboard camera video in the courtroom during deliberations.

## II

The defendant next claims that the court violated his right to confront a witness against him, pursuant to the confrontation clause of the sixth amendment to the United States constitution. In the alternative, the defendant argues that the confrontation clause within article first, § 8, of our state constitution should be expanded to include rights beyond those protected by its federal counterpart by prohibiting the admission of nontestimonial hearsay. We disagree that the defendant's right to confront a witness against him pursuant to the sixth amendment was violated and conclude that there exists no legal basis that suggests that our state constitution provides the defendant any broader protection to confront a witness against him.

The following procedural history and additional facts, which reasonably could have been found by the jury, are relevant to this claim. After unsuccessfully pursuing the fleeing Charger, Rodriguez went to the medical center, where he received treatment for his injured foot.

Rodriguez arrived at the medical center at approximately 1 p.m. on December 12, 2008, and saw two nurses and a physician, Giac Chan Nguyen-Tan. Nguyen-Tan was unavailable to testify at the trial, so Fred Tilden, a physician and director of the medical center's emergency department, testified in his stead. Tilden testified that part of his duties were clinical and part were administrative. He testified that he often reviews the records of the physicians and other employees he supervises, and that he reviewed the records made in conjunction with the treatment of Rodriguez. The medical records of Rodriguez' visit to the medical center were entered into evidence under the business record exception to the hearsay rule, and defense counsel did not object to their admission.

Tilden read from the medical records the written notes of the triage nurse, the primary nurse and Nguyen-Tan. The note written by the triage nurse, who first saw Rodriguez when he entered the emergency room, stated in relevant part, "left foot run over by car at work . . . ." Rodriguez next saw the primary nurse, who, according to Tilden's reading of the medical record, wrote in relevant part, "patient at scene—scene of arrest and suspect—suspect tried to flee and ran over left foot . . . ." Nguyen-Tan was the last medical personnel to see Rodriguez. Nguyen-Tan's note diagnosed Rodriguez with a "contusion slash crush injury [to his] left foot."[3]

Tilden also testified, based on his knowledge of the general procedures followed by the nurses and physicians at the medical center, that before examining a patient Nguyen-Tan would have looked for the patient's chief complaint, which was contained in a note on the

[3] According to the testimony of Tilden, "[a] crush injury is when there's been a lot of weight on the—whatever part of the body has been affected, in this case, a foot."

front of the medical records written by the triage and primary nurses. All chief complaints are self-reported by the patient. Rodriguez' chief complaint stated, "left foot run over by car while—while on duty, denies any other injury." Tilden testified that Nguyen-Tan's diagnosis of a crush injury would have been based "a hundred percent" on what Rodriguez told him.[4] "[Nguyen-Tan] hears the report of the acc—an accident and he decides the [word] crush is appropriate," Tilden elaborated.

## A

With regard to Tilden's testimony, the defendant first claims a violation of his federal right of confrontation as protected by the sixth amendment to the United States constitution. "The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, *Pointer* v. *Texas*, 380 U.S. 400, 403 [85 S. Ct. 1065, 13 L. Ed. 2d 923] (1965), provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 309, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). "Under *Crawford* v. *Washington*, [541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], hearsay statements of an unavailable witness that are testimonial in nature may be admitted in accordance with the confrontation clause only if the defendant previously has had the opportunity to cross-examine the unavailable witness. Nontestimonial statements, however, are not subject to the confrontation clause and may be admitted under state rules of evidence. *Davis* v. *Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d

---

[4] Tilden also testified that an X ray of Rodriguez' foot showed no fracture, but it did show swelling that would support a diagnosis of a crush injury. The court sustained an objection to a question asking Tilden to speculate whether Nguyen-Tan's diagnosis was consistent with Rodriguez' injury on the ground that Tilden did not treat the patient. The court did allow, however, Tilden to testify that a car could cause a crush injury to a foot.

224 (2006). Thus, the threshold inquiries that determine the nature of the claim are whether the statement was hearsay, and if so, whether the statement was testimonial in nature, questions of law over which our review is plenary. *State* v. *Slater*, 285 Conn. 162, 170, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008)." *State* v. *Smith*, 289 Conn. 598, 618–19, 960 A.2d 993 (2008).

The defendant concedes that his claim of a *Crawford* violation was unpreserved at trial and therefore seeks review under the familiar four prongs of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), which state that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id., 239–40.

Answering the threshold question in a *Crawford* analysis—whether the statements in question were testimonial in nature—also answers whether the defendant has met the burden presented under *Golding*'s second prong, which requires a claim of constitutional magnitude. See *State* v. *Jennings*, 125 Conn. App. 801, 813, 9 A.3d 446 (2011) ("the alleged violation fails under the second prong of *Golding* and is not reviewable . . . because . . . [it did not concern a] testimonial hearsay statement as defined in *Crawford*"); *State* v. *Claudio C.*, 125 Conn. App. 588, 598–99, 11 A.3d 1086 (2010) (concluding that defendant's unpreserved *Crawford*

claim failed to meet second prong of *Golding* because declarant testified at trial and was subject to cross-examination), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011). The defendant contends that the statements within the medical records are testimonial in nature, and that their admission violated his fundamental right to confront a witness against him pursuant to the United States constitution. We disagree.

"The text of the Confrontation Clause . . . applies to witnesses against the accused—in other words, those who bear testimony. . . . Testimony, in turn, is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . . Various formulations of this core class of testimonial statements exist: ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it." (Citations omitted; internal quotation marks omitted.) *Crawford* v. *Washington*, supra, 541 U.S. 51–52. "To determine if a statement is testimonial, we must decide whether it has a primary purpose of creating an out-of-court substitute for trial testimony. . . . When the primary purpose of a statement is not to create a record for trial . . . the admissibility of [the] statement is the concern of the state and federal rules of evidence, not the Confrontation Clause . . . ." (Citations omitted;

internal quotation marks omitted.) *Bullcoming* v. *New Mexico*, 564 U.S. 647, 669, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) (Sotomayor, J., concurring in part).

The defendant argues that Tilden's testimony contained testimonial statements made by Nguyen-Tan. The United States Supreme Court has recognized that medical records do not fall within the definition of testimonial statements as set forth in *Crawford*. "See [*Michigan* v. *Bryant*, 562 U.S. 344, 362 n.9, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)] (listing 'Statements for Purposes of Medical Diagnosis or Treatment' under Federal Rule of Evidence 803 (4) as an example of statements that are 'by their nature, made for a purpose other than use in a prosecution'); [*Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 312 n.2] ('[M]edical reports created for treatment purposes . . . would not be testimonial under our decision today'); *Giles* v. *California*, 554 U.S. 353, 376 [128 S. Ct. 2678, 171 L. Ed. 2d 488] (2008) ('[S]tatements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules')." *Bullcoming* v. *New Mexico*, supra, 564 U.S. 672 (Sotomayor, J., concurring in part).

The defendant argues that the recent decision of the United States Supreme Court in *Bullcoming* v. *New Mexico*, supra, 564 U.S. 647, alters how the confrontation clause defines testimonial and nontestimonial statements within medical records. In *Bullcoming*, the Supreme Court held that an analyst's statements within a forensic laboratory report about a blood sample, which was taken for purposes of determining a defendant's blood alcohol level after the defendant failed field sobriety tests and was arrested for driving while intoxicated, were testimonial for purposes of the confrontation clause. Id., 665. The court reasoned that the analyst who conducted a forensic blood test at the request of the police in *Bullcoming* was analogous to the forensic laboratory that analyzed, upon police

request, seized evidence bags for traces of narcotics in *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 305. *Bullcoming* v. *New Mexico*, supra, 663–64. The logical linchpin between these two cases is that "[a] document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." Id., 664. The Supreme Court was not persuaded by the argument that a lack of notarization was the key distinction between the certificate in *Melendez-Diaz* and the certificate in *Bullcoming*; rather, the court concluded that the purpose of the certificate—to establish or prove some fact in a criminal proceeding—was what qualified the certificate as testimonial and, therefore, within the protections afforded a criminal defendant under the confrontation clause. Id., 664–65.

The defendant urges this court to analogize Nguyen-Tan's statements within Rodriguez' medical records to the statements of the analysts who signed the forensic reports in *Bullcoming* and *Melendez-Diaz*. But, clearly neither *Bullcoming* nor *Melendez-Diaz* stand for the principle that medical records should be treated in the same manner as forensic reports. See id., 672–74 (Sotomayor, J., concurring in part) (explaining "the limited reach of the Court's opinion"; id., 668; in part because "the State [did] not [claim] that the report was necessary to provide [the defendant] with medical treatment"; id., 672); *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 312 n.2 (noting that some cases cited by the dissent "are simply irrelevant, since they involved medical reports created for treatment purposes, which would not be testimonial under our decision today"). In fact, "[m]ost courts considering statements made for medical treatment . . . have concluded that, if an interview is done strictly for medical purposes, and not in anticipation of criminal proceedings, the statements would be considered nontestimonial." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 389, 908 A.2d

506 (2006). "The key to the inquiry is whether the examination and questioning were for a diagnostic purpose and whether the statement was the by-product of substantive medical activity. . . . Also significant to whether the statement is testimonial is whether such statements . . . accuse or identify the perpetrator of the assault." (Citation omitted; internal quotation marks omitted.) Id., 391.

The defendant argues that Rodriguez' status as a police officer seeking treatment for an injury that occurred while he was on duty alters the primary purpose of the medical records from diagnosing an injury to establishing a fact in a criminal proceeding. Though the nurses and Nguyen-Tan were likely aware that the plainclothed Rodriguez was a police officer because of discussions with him about how his injury occurred and the police badge displayed on his belt, such knowledge did not alter the primary purpose of the statements made by the nurses and Nguyen-Tan in the creation of Rodriguez' medical record.[5] Nguyen-Tan's diagnosis of a crush injury to Rodriguez' foot was made for the primary purpose of treating Rodriguez' injury. The fact that Rodriguez is a police officer and the speculation that the treating medical personnel could have been aware that criminal prosecution was a possible result of the officer's injury present a distinctly different scenario than that of an analyst performing a forensic analysis at the direction of a police officer for the primary purpose of criminal prosecution. None of the statements within Rodriguez' medical records were testimonial, nor does *Bullcoming* change the admissibility of medical records containing nontestimonial hearsay. The

---

[5] We note that Rodriguez' statements within the medical record could not be subject to a confrontation clause argument because "*Crawford* makes clear . . . that, when the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 652, 945 A.2d 449 (2008).

medical records in this case were properly admitted,[6] and having Tilden read the statements of Nguyen-Tan and the nurses contained within the medical records did not constitute a violation of the defendant's sixth amendment right to confront a witness against him.

### B

The defendant next argues that the protections afforded by the confrontation clause of the Connecticut constitution extend beyond those afforded by the United States constitution. We disagree.

The pertinent factors in an analysis of whether the protections in our state constitution should be construed to extend beyond the protections set forth in the United States constitution were set forth in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992). "These factors are: (1) the text of the operative constitutional provision; (2) holdings and dicta of this court and the Appellate Court; (3) persuasive and relevant federal precedent; (4) persuasive sister state decisions; (5) the history of the operative constitutional provision, including the historical constitutional setting and the debates of the framers; and (6) contemporary economic and sociological considerations, including relevant public policies." *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 157, 957 A.2d 407 (2008). The *Geisler* factors "may be inextricably interwoven" and "not every *Geisler* factor is relevant in all cases." (Internal quotation marks omitted.) Id.

Historically, our Supreme Court has interpreted Connecticut's confrontation clause to provide the same protections as its federal counterpart. See, e.g., *State* v. *Pratt*, 235 Conn. 595, 599 n.6, 669 A.2d 562 (1995); *State* v. *Munoz*, 233 Conn. 106, 139–42, 659 A.2d 683 (1995);

---

[6] Rodriguez' medical records were admitted pursuant to Connecticut Code of Evidence § 8-4, and the nontestimonial statements within the records were admitted pursuant to Connecticut Code of Evidence § 8-3 (5).

*State* v. *Jarzbek*, 204 Conn. 683, 707–708, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). Recently, our Supreme Court explained the legal and logical underpinnings of this interpretation. "[W]ith respect to the right to confrontation within article first, § 8, of our state constitution, its language is nearly identical to the confrontation clause in the United States constitution. The provisions have a shared genesis in the common law. See *Crawford* v. *Washington*, [supra, 541 U.S. 43] ('[t]he founding generation's immediate source of the concept [of the right of confrontation] . . . was the common law'); *State* v. *Torello*, 103 Conn. 511, 513, 131 A. 429 (1925) (purpose of confrontation clause in state constitution was 'to mark, preserve, protect and perpetuate a right existing under the common law'). Moreover, we have acknowledged that the principles of interpretation for applying these clauses are identical. *State* v. *Gaetano*, 96 Conn. 306, 310, 114 A. 82 (1921). Therefore, we are not convinced that we should, in this context, construe the confrontation clause of our state constitution to provide greater protections than its federal counterpart." *State* v. *Lockhart*, 298 Conn. 537, 555, 4 A.3d 1176 (2010). The context the Supreme Court was referring to in *Lockhart* was one in which the defendant argued that our confrontation clause included a corroboration requirement for the admissibility of confessions, and the court disagreed. While the defendant in this case requests extending our confrontation clause in a different manner, the analysis of *Lockhart* still guides our conclusion.

In the brief time since our Supreme Court conducted the *Geisler* analysis of the confrontation clause in *Lockhart*, no decision from our state courts or from our sister states' appellate courts has called into question the soundness of its logic. Further, there are no compelling economic or sociological concerns that have arisen

since the analysis was authored that would support a change in the interpretation of our confrontation clause.

### III

The defendant next claims that the court violated his federal and state confrontation clause rights by not conducting an in camera review of Rodriguez' personnel file and disclosing to the defense any relevant and material information pertaining to Rodriguez' credibility. We disagree.

The following procedural history and additional facts, which reasonably could have been found by the jury, are relevant to this claim. After Rodriguez discharged his firearm, the Meriden police department conducted an internal affairs investigation of the incident. The defendant served a subpoena upon the Meriden police department seeking to obtain a copy of both the internal affairs report and Rodriguez' personnel file. Just prior to the commencement of the defendant's trial, the court addressed the subpoena by ordering that the defendant be provided the internal affairs report, and soliciting argument pertaining to Rodriguez' personnel file.

The court stated that the initial burden lay with the defendant to indicate that the personnel file contained something that was needed in order to exercise the defendant's right of confrontation. In response to the court's instruction that the contents of the personnel file would not be disclosed for a mere "fishing expedition," defense counsel stated, "I don't believe that I have a good faith basis to make a claim as to the personnel file." When pressed to make an argument, defense counsel argued that the alleged inconsistencies between the dashboard camera video and Rodriguez' testimony called into question whether Rodriguez had the ability to properly recollect or relay the truth. The court stated that the defendant's concern was proper, but that it was purely speculative to suggest that something in the

personnel file would be indicative of Rodriguez' truth-telling abilities. The court denied the defendant's request to conduct an in camera review of Rodriguez' personnel file and filed it under seal as a court exhibit for identification.

"We review a court's conclusion that a defendant has failed to make a threshold showing of entitlement to an in camera review of statutorily protected records, including police personnel records, under the abuse of discretion standard. . . . We must make every reasonable presumption in favor of the trial court's action. . . . The trial court's exercise of its discretion will be reversed only where the abuse of discretion is manifest or where injustice appears to have been done. . . .

"Although public records generally are available pursuant to the Freedom of Information Act, General Statutes § 1-200 et seq., the confidentiality of information in police personnel files that may be relevant to a witness' credibility is protected by General Statutes § 1-210 (b) (2). . . . We have found error in the refusal of a trial court to examine documents in camera where a sufficient foundation has been laid to indicate a reasonable likelihood that they contain material relevant to the case or useful for impeachment of a witness. . . . We emphasize that a defendant's request for information from a confidential police personnel file should be specific and should set forth the issue in the case to which the personnel information sought will relate. . . . No criminal defendant has the right to conduct a general fishing expedition into the personnel records of a police officer. Any request for information that does not directly relate to legitimate issues that may arise in the course of the criminal prosecution ought to be denied." (Citations omitted; internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 506–507, 828 A.2d 1248 (2003).

In this case, defense counsel sought access to the material in Rodriguez' personnel file because of perceived inconsistencies between his testimony and the visual evidence of the dashboard camera video. Defense counsel speculated that the personnel file might contain information pertaining to Rodriguez' cognitive abilities or propensity for truth-telling. The court correctly informed defense counsel that while those issues were reasonable concerns, he had not shown any connection between anything in the personnel file and the concerns about Rodriguez' truthfulness. A showing sufficient to warrant an in camera review of a personnel file requires more than mere speculation. Compare *State* v. *Januszewski*, 182 Conn. 142, 170, 438 A.2d 679 (1980) (affirming grant of in camera review of police officer's personnel file to verify knowledge, based on information and belief, that officer was subject of disciplinary actions prior to incident giving rise to prosecution), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981) with *State* v. *Erickson*, 297 Conn. 164, 997 A.2d 480 (2010) (affirming denial of in camera review of police officer's personnel records where defendant sought information relating to complaints about misappropriation of funds when officer's credibility was a central issue in case). Our Supreme Court distinguished the two cases because, in *Januszewski*, "the defendant sought permission to inspect the personnel file of the arresting officer 'to verify knowledge, based on information and belief,' " whereas in *Erickson*, the defendant offered "no information or knowledge of prior complaints or disciplinary actions" on which to base his request to view the officer's personnel file. *State* v. *Erickson*, supra, 183–84.

Defense counsel's request was much more akin to a fishing expedition than a specific request that set forth how the information in Rodriguez' personnel file would relate to an issue in the case. Defense counsel offered

no information or knowledge that the personnel file contained anything with regard to Rodriguez' truthfulness or credibility. While "[a]n in camera inspection of the documents involved . . . will under most circumstances be necessary . . . routine access to personnel files is not to be had." (Internal quotation marks omitted.) Id., 178. Allowing unfounded speculation that a witness is a liar to suffice would effectively allow routine access to witnesses' personnel files. The trial court did not abuse its discretion in refusing to conduct an in camera review of Rodriguez' personnel file.

The judgment is affirmed.

In this opinion the other judges concurred.